No. 20-3147

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT
_____

CAMILLE STURDIVANT

Plaintiff-Appellee

v.

CARLEY FINE

Defendant-Appellant
_____

**RESPONDENT BRIEF OF
PLAINTIFF/APPELLEE CAMILLE STURDIVANT**
_____

Appeal from the United States District Court for the District of Kansas
Civil No. 18-2661-JWL
The Honorable John W. Lungstrum - United States District Judge

Marie L. Gockel, Ks. Bar No. 12591
Lynne Jaben Bratcher, Dist. Bar No. 70502
Erin Vernon, Ks Bar No. 25792
BRATCHER GOCKEL LAW, L.C.
4014 B South Lynn Ct.
Independence, MO  64055
Ph: (816) 221-1614
lynne@bgklawyers.com
marie@bgklawyers.com
erin@bgklawyers.com

Attorneys for Plaintiff-Appellee

ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES……………………………………………………3

STATEMENT OF RELATED CASES…………………………………………6

JURISDICTIONAL STATEMENT……………………………………………6

STATEMENT OF ISSUES PRESENTED FOR REVIEW………………………8

STATEMENT OF THE CASE…………………………………………………8

STATEMENT OF FACTS……………………………………………………..10

SUMMARY OF ARGUMENT………………………………………………...27

ARGUMENT…………………………………………………………………..30

CONCLUSION………………………………………………………………...60

ORAL ARGUMENT REQUESTED…………………………………………..60

CERTIFICATE OF COMPLIANCE…………………………………………..61

CERTIFICATE OF DIGITAL SUBMISSIONS………………………………62

CERTIFICATE OF SERVICE………………………………………………...63

ADDENDUM…………………………………………………………………64

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page**

*A.M. v. Holmes,* 830 F.3d 1123, 1135 (10th Cir. 2016)…………………………58

*A.N. by and through Ponder v. Syling*, 928 F.3d 1191, 1196-99
(10th Cir. 2019)……………………………………………………………………30, 46

*Anderson v. Creighton,* 483 U.S. 635, 640 (1987)…………………………..44, 45

*Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 742, 131 S.Ct. 2074,
179 L.Ed.2d 1149 (2011)………………………………………………………..45

*Baca v. Sklar,* 398 F3d 1210, 1218 n. 3 (10th Cir. 2005)………………………..33

*Billings v. Madison Metropolitan School District*,
259 F.3d 807, 813-14, 816-17 (7th Cir. 2001)………………………………..53,54

*Brosseau v. Haugen,* 543 U.S. 194, 198 (2004)…………………………………47

*Brown v. Flowers,* 974 F.3d 1178, 1182, 1184-86 (10th Cir. 2020)……..32, 48, 58

*Bryant v. Independent School District No. I-38 of Garvin County, Ok.,*
334 F.3d 928, 931-34 (10th Cir. 2003)………………………………………40, 54

*Buchanan v. City of Bolivar, Tenn.*, 99 F.3d 1352, 1360 (6th Cir. 1996)……….55

*Cannon v. City & County. of Denver,* 998 F.2d 867, 870-71 (10th Cir. 1993)….44

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)…………..34

*Connecticut v. Teal,* 447 U.S. 440, 455 (1982)…………………………………37

*Corona v. Aguilar,* 959 F.3d 1278, 1285-86 (10th Cir 2020)………………..30, 44

*Contreras v. Dona Ana County Board of County Commissioners,*
965 F.3d 114, 1122, 1135 (10th Cir. 2020)……………………………………..48,56

*Cox v. Glanz*, 800 F3d 1231, 1242 (10th Cir. 2015)……………………………...32

*Doe v. Fournier, 851 F. Supp.* 2d 207, 220-21 (D. Mass. 2012)……………....42

*Doe v. Hutchinson*, 728 Fed. Appx. 829 (10th Cir. 2018)
(unpublished) [1]…………………………………………………………34, 42, 44, 51, 58

*Fancher v. Barrientos*, 723 F.3d 1191, 1198-1199 (10th Cir. 2013)……………32

*Fitzgerald v. Barnstable School Committee,* 129 S.Ct. 788, 797,
555 U.S. 246 (2009)……………………………………………...34, 50, 52, 54, 56

*Gann v. Cline*, 519 F.3d 1090, 1092 (10th Cir. 2008)……………………………45

*Gallagher v. Neil Young Freedom Concert,* 49 F.3d 1442, 1447
(10th Cir. 1995)………………………………………………………………………40

*Griffin v. Maryland,* 378 U.S. 130, 135, 84 S.Ct. 1770, 1772-73,
12 L.Ed.2d 754 (1964)………………………………………………………………42

*Heyne v. Metropolitan Nashville Pub. School*, 655 F.3d 556, 571
(6th Cir. 2011)………………………………………………………………………55

*Hope v. Pelzer*, 536 U.S. 730, 739, 741, 122 S.Ct. 2508 (2002)………45, 46 50, 54

*Jackson v. Birmingham Board of Education,* 544 U.S. 167, 173-74 (2005)……..38

*Johnson v. Jones,* 515 U.S. 304, 307, 313, 315-18, 115 S.Ct. 2151 (1995)………32

*Jojola v. Chavez*, 55 F.3d 488, 492-94 (10th Cir. 1995)…………………..33, 40, 42

*Kerns v. Bader*, 663 F.3d 1173, 1186 (10th Cir. 2011)……………………………46

*McLaurin v. Oklahoma State Regents for Higher Education*,
339 U.S. 637, 639-40, 642 (1950)………………………….28, 44, 52, 53, 54, 56, 57,59

*Mglej v. Raymond Gardner,* 974 F.3d 1151, 1159 (10th Cir. 2020)…………..31, 32

---

[1] Unpublished decisions cited in this brief are set forth in the Appendix to this brief as required by U.S. Ct. of App. 10th Cir. Rule 32.1.

*Mimics, Inc. v. Village of Angel Fire,* 394 F.3d 836, 842 (10th Cir. 2005)……….58

*Mitchell v. Forsyth*, 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)……………………………………………………….32, 40

*Mullinex v. Luna,* 136 S.Ct. 305, 308, 312 (2015)…………....31, 44, 45, 48, 49, 54

*Murrell v. School District No. 1, Denver, Colorado,* 186 F.3d 1238, 1250-51 (10th Cir. 1999)……………………………………………….34, 51, 52

*Nieto v. Kapoor*, 268 F.3d 1208, 1215-1220 (10th Cir. 2001)…………………….33

*Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)………………………………………………………….31, 47

*Pierce v. Gilchrist*, 359 F.3d 1279, 1298-1300 (10th Cir. 2004)……….30, 45, 56

*Pitre v. Western Electric Company, Inc.,* 843 F2d 1262, 1273 (10th Cir. 1988)……………………………………………………………37

*Plumhoff v. Rickard,* 572 U.S. 765, 768, 134 S.Ct. 2012, 2017, 188 L.Ed.2d 1056 (2014)……………………………………………………31

*Ramirez v. Department of Corrections*, 222 F.3d 1238, 1241-44, 1341-44 (10th Cir. 2000)……………………………….28, 33, 34, 44, 46, 47, 50, 52, 57, 59

*Requena v. Roberts*, 893 F.3d 1195, 1210 (10th Cir. 2018)………………………34

*Saucier v. Katz*, 531 U.S. 991, 121, S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001)…………………………………………………………..47

*Sawyers v. Norton,* 962 F.3d 1270, 1281 (10th Cir. 2020)………………………..32

*Sh.A. v. Tucumcari Municipal School,* 321 F.3d 1285, 1287, 1289 (10th Cir. 2003)………………………………………………………..31, 31, 50, 52

*Starrett v. Wadley*, 876 F.2d 808, 814 (10th Cir. 1989)…………………………..54

*Townsend-Johnson v. Cleveland*, 894 Fed.Appx. 833 (10th Cir. 2012) (unpublished)……………………………………………………………..51

*White v. Pauly,* 580 U.S. __,  137 S.Ct. 548-49, 552 (2017)…………31, 35, 47, 49

*Zeno v. Pine Plains Central School District*, 702 F.3d 655, 666 (2d Cir. 2012)…52

## Constitution

Equal Protection Clause of the Fourteenth Amendment to the United States Constitution…………………………………………………………...6, 8, 33, 44

## Statutes and Rules

28 U.S.C. § 1331……………………………………………………………..6

28 U.S.C. § 1343(a)(3)………………………………………………………6

34 C.F.R. § 100.3(b)(1)(i)-(vii)…………………………………..23, 40, 44, 52, 55

42 U.S.C. § 1983……………………………………6, 8, 27, 34, 44, 51, 54, 55, 58

Title VI of Civil Rights Act of 1964, 42 U.S.C. § 2000d……………..6, 34, 44, 55

U.S. Ct. of App. 10th Cir. Rule 32.1……………………………………...4

## STATEMENT OF RELATED CASES

There are no prior or related appeals.

## JURISDICTIONAL STATEMENT

Jurisdiction in the district court exists based upon 28 U.S.C. §§ 1331 and 1343(a)(3), as the acts complained of seek redress for deprivations of Sturdivant's rights under federal law, under 42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

Sturdivant asserts that appellate court jurisdiction for Fine's interlocutory appeal to this Circuit is absent to the extent Fine challenges the district court's factual determinations in relation to whether sufficient facts were presented on the issue whether Fine committed a constitutional violation of law.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. Did the district court properly deny Fine's motion for summary judgment seeking qualified immunity against Sturdivant's claim of violation of equal protection under 42 U.S.C. § 1983, based on Fine's conduct in directing a boycott of Sturdivant by team members and their parents, resulting in the exclusion of Sturdivant, based on race, from educational benefits and opportunities as a member of her high school dance team, conduct Fine engaged in under color of state law and conduct of which Fine did not engage in towards her non-black students?

2. Did the district court properly deny Fine's motion for summary judgment seeking qualified immunity because Fine violated Sturdivant's clearly established equal protection right not to be excluded from the receipt and enjoyment of educational benefits and opportunities on the basis of her race, as established by relevant law addressing violations of equal protection based on race in employment and educational settings?

## STATEMENT OF THE CASE

On December 5, 2018, Sturdivant filed her Complaint [Doc 1], and on March 28, 2019, her First Amended Complaint [Doc 34] , that included, *inter alia*, her claim against Fine under 42 U.S.C. § 1983 for violation of the Equal Protection Clause of

the Fourteenth Amendment. App. 3, 7.[2]  Following discovery, Fine filed a motion

for summary judgment seeking to have the Court determine as a matter of law that

Fine is entitled to qualified immunity against Sturdivant's equal protection claim.

App. 66-67.  On June 30, 2020, the district court entered its Memorandum and Order

denying summary judgment to Fine.  App. 289-320.  The district court also overruled

a motion to file Fine's summary judgment exhibits under seal.  App. 319-20 – Order,

p. 31-32.  Fine filed this interlocutory appeal seeking to overturn the district court's

denial of summary judgment to her.  App. 321-322.  The deposition transcripts

included in Sturdivant's Memorandum in Opposition to Defendant Fine's Motion

for Summary Judgment [Doc. 148] are included in Sturdivant's Supplemental

Appendix, which were refiled following the court's order regarding the filing of

depositions under seal.  Supp. App. 327-615.

---

[2] References to the appendix and supplemental appendix will be abbreviated
as follows: App _ (Appendix); Supp. App __(Supplemental Appendix); App-___ -
Order at __ Memorandum & Order of District Court [Doc. 162]; App-___ - Pretrial
Order ¶ __ [Doc. 129].

## STATEMENT OF FACTS

**A.    *Background and Parties*.**

Blue Valley School District, USD 229 (BVSD), a Kansas public school district, employed Defendant Carley Fine (Fine) first as an assistant and then as head coach of students selected for the dance team known as the "Dazzlers" for Blue Valley Northwest High School (BVNW), in Overland Park, Kansas.  App. 38-39, ¶¶ 1, 4; App. 217, ¶ 1; Supp. App. 507 - 19:2-15.

Plaintiff Camille Sturdivant (Sturdivant) is a black student who attended BVNW for all four years of high school from August 2014 through her graduation on May 12, 2018.  App. 39 - Pretrial Order, ¶ 3; App. 217,  ¶¶ 1-2.  During her sophomore (2015-16), junior (2016-17) and senior (2017-18) years of high school, Sturdivant was one of fourteen members of BVNW's Dazzlers dance team, as well as a member of the National Honor and Spanish Honor Societies.  App. 44, 250 (Ex. 8).   Sturdivant currently attends the University of Missouri as a sophomore.  Supp. App. 327 –  10:8-10.

Fine is Caucasian.  App. 39, ¶ 4.  During the 2017-18 school year, Sturdivant, along with then-freshman Armani Williams, were the only two Black members of the fourteen-member Dazzlers team.  App. 41-42 - Pretrial Order, ¶ ¶ 14, 24.

Participation in the Dazzlers was part of the BVSD curriculum, which required Dazzler team members to take a first-hour class as part of their regular

schedule during the school day.  Dazzlers received letter grades in the fall semester for the class and a pass/fail designation in the spring semester.  App. 180 – Pretrial Order ¶ 11; Supp. App. 355 – 121:9-122:2.

### B.  *Fine's Employment with BVSD.*

The district court expressly found the existence of factual disputes precluding summary judgment concerning whether Fine acted under color of state law during the events that form the basis of the claimed constitutional violations at issue in this lawsuit.  App. 309 – Order, p. 21.

BVSD employed Fine through a written employment contract beginning in the summer of 2016, initially as assistant coach of the Dazzlers.  In early 2017, in the second half of Sturdivant's junior year, BVSD promoted Fine to the position of Head Coach of the Dazzlers.  Supp. App. 507– 19:2-11.  The employment contract between BVSD and Fine included the entirety of the 2017-18 school year that ended May 24, 2018.  App. 221, ¶49.  Fine remained a paid employee of BVSD at BVNW High School until her employment contract ended on May 24, 2018, at the end of the 2017-2018 school year.  *Id.*  As noted by the district court, the record showed no one filled the role of Coach for the remainder of the school year.  App. 294 – Order, p. 6, n. 4.

Kevin **Murakami** was an independent contractor of BVSD, paid to provide dance choreography services for the Dazzlers from the fall of 2015 until May 2,

2018.  App. 39 - Pretrial Order, ¶ 5; Supp. App. 506 – 17:15-23.

**C.**     ***April 2018 -- Fine's "Fucking Black" Racial Slur Referencing Sturdivant.***

As a high school senior, Sturdivant tried out and was selected to become a member of the University of Missouri's prestigious and elite "Golden Girls" dance squad.[3]  Equally impressive, the University of Missouri selected Sturdivant for the most elite Golden Girl dance squad — the men's — where she will be a member of the dance team for performances at football and other men's sports, starting in her upcoming freshman college year.  Sturdivant not only made the same college dance team as a freshman but successfully made the team as a college sophomore.  Supp. App. 327– 10:13-14.

The news of Sturdivant's selection for the University of Missouri's Golden Girl team reached Fine and Murakami sometime in April 2018.  App. 232 – Supp. App. 553-555 – 37:6-45:25.

Instead of celebrating the achievement of one her own students, Fine denigrates the University of Missouri's choice of Sturdivant as a "Golden Girl" to that of a choice based not on any of the skills or abilities that earned her the most desirable spot on the SEC team over hundreds of other candidates, but instead, on Sturdivant's skin color.  "Because she is fucking black," Fine opines to

---

[3] The University of Missouri's "Golden Girls" have been in existence for over 60 years, since 1957.  *See* https://mutigers.com/sports/2015/7/29/GG_tradition.aspx.

choreographer Murakami. Fine and Murakami text each other over their anger as to why plaintiff was selected over other candidates including another of Fine's students, who is Caucasian. Fine texts Murakami that she "hates" that the choice of Sturdivant as a "Golden Girl" and that Sturdivant had been selected to the men's team. According to Fine's way of thinking, the selection was made because Sturdivant is "fucking black." Murakami, through an emoji, adds, "Ha Ha" to Fine's racial slur referencing Sturdivant. App. 5, Ex. 9.

### D. *May 2018 Events.*

During the Dazzlers' practices held at BVNW, Fine regularly permits her students to use her cell phone to access music for the dance routines. Some of the dance music is found as attachments or links on text messages stored on Fine's cell phone between the Dazzler's choreographer, Murakami, and Fine. To facilitate her students' use of her personal cell phone to access dance music, Fine also shared her cell phone's password with her students. On May 1, 2018, Sturdivant and the other members of the Dazzlers were practicing for their annual Spring Show, scheduled for May 3 and May 4, 2018. During practice, two other team members, having already accessed Fine's phone with her password, were attempting to find the specific dance music on Fine's cell phone, consistent with past practice of the Dazzlers using Fine's phone and password to find and play music for various routines. Supp. App. 365 - 162:5-164:24. The two members who were searching

for music on Fine's phone handed the phone to Sturdivant for assistance in locating the music. *Id.* The other members told Sturdivant that they thought the music was in a text exchange between Fine and Murakami. *Id.* When handed to Sturdivant, the phone was unlocked and opened to a text exchange between Fine and Murakami. Supp. App. 366 - 166:4-13. Sturdivant then saw the following text exchange between Fine and Murakami:

**Murakami:  I can't believe Maggie didn't make it again.  I'm heart broken.**

**Fine:  AND CAMILLE [STURDIVANT] MADE MENS. I can't talk about it.**

**Murakami:  THAT DOESN'T MAKE SENSE. I'm so mad.**

**Fine:  It actually makes my stomach hurt.**

**Fine:  Bc she's fucking black. I hate that.**

**Murakami:  [laughing emoji]**

**Murakami: me too**

App. 232; Supp. App. 553-55 – 37:6-45:25.

With her own phone, Sturdivant took photos of the text exchange and shared that exchange with her parents.  That evening, Sturdivant's mother, Melodie Sturdivant, sent the picture of the text exchange to Ms. Amy Pressly, principal of BVNW.  Supp. App. 335 - 1-5; Supp. App. 228, 334-336 - 37:15-49:8.

### E. *May 2, 2018 Meeting and Continuation of Fine's Employment.*

On May 2, 2018, the next morning, Pressly held a meeting with Fine, Nacole Boan, assistant principal of BVNW, and Dr. Amy Dillon, the Director of Human Resources for classified personnel for BVSD. Supp. App. 510 - 31:13-20; 36:3-37:12; Supp. App. 607-608 - 64:12-66:8. Dillon notified Fine during that meeting that she was no longer the coach of the Dazzlers and that she was not permitted to attend or participate in any Dazzlers events at school, including the upcoming Spring Show. Supp. App. 490 - 15:7-17:18. BVSD, however, did not terminate Fine's employment. Supp. App. 491 - 18:7-25:11; App. 243; Supp App. 491-92. Although Dr. Dillon advised Fine that she had "fulfilled her contract" with the District, Fine's contract did not end until May 24, 2018 and she was paid under the contract until that time. *Id.* Fine had already informed the District that she would not be back to coach during the 2018-2019 school year because she was too busy with her own private dance school, Perception Studio. App. 504 - 9:8-15.

Fine's authority following the May 2, 2018, meeting was a disputed fact issue. As found by the district court, Fine's employment under her employment contract was explicitly **not** terminated by the District at the May 2, 2018 meeting, nor at any other time. App. 37, 39 - Pretrial Order, ¶ 4; Depo Exs. 60, 71.

The Court's Pretrial Order included, *inter alia,* **both** the following Stipulation in paragraph 4 solely relied upon by Fine in her opening brief but also

the following statements of Sturdivant's contentions, ignored by Fine but not by the district court in its Opinion:

"4. Fine, is Caucasian, and was coach of the Dazzlers beginning in the summer of 2016, before being promoted to head coach of the Dazzlers in early 2017. She remained in that position until May 2, 2018." App. 39 - Pretrial Order, ¶ 4.

Sturdivant's factual contentions in the Pretrial Order made clear that Sturdivant had not in any way stipulated that Fine's employment was terminated on May 2, 2018 nor at any other time thereafter except through the natural expiration of her employment contract at the end of the 2017-2018 school year. Sturdivant's pretrial factual contentions in the Pretrial Order state:

"On May 2, 2018, Dr. Pressley and Dillon met with Fine and suspended her from working further with the Dazzlers on campus. **Fine was not terminated**, just told her contract had been completed and she was paid completely. She was told she could not come to the spring show scheduled for May 3 and 4 and she was not to be on campus." App. 47-48, Pretrial Order, ¶ 3.a, pp. 10-11; App. 233, Supp. App. 505-06, 11:24-14:10.

In response to an email from Fine shortly following the meeting, inquiring about her employment status with BVSD, Dillon's reply reaffirmed the intentions expressed at the May 2, 2018 meeting, as follows:

'Carley:  As stated in the meeting, **you were not terminated**.  You fulfilled your supplemental contract and will be compensated fully for that contract.  We request that you not attend on campus end of the year activities with the Dazzler dance team.  Currently there are no restrictions regarding your future work with our district.'"  App. 233- Supp. App. 505-06 – 11:24-14:10.

In its Order denying qualified immunity to Fine, the district court analyzed in detail the facts supporting its conclusion that sufficient evidence existed for a jury to conclude that Fine acted under color of state law to deprive Sturdivant of educational benefits and opportunities before the natural expiration of her employment contract.  The Court pointed out that it was "undisputed that the District did not terminate Fine's employment on May 2, 2018.  Her contract with the District did not expire until mid- to late May.  So, while the District advised Fine that she had fulfilled her contractual obligations to it as of May 2, 2018, she was still on the District's payroll at the time of the alleged incidents here."  App. 313-314 – Order, pp. 25-26.

In addition to finding that Fine was employed with BVSD during the events at issue, the district court found Fine's conduct could be fairly attributed to her employer from the existence of a "real nexus" between Fine's use or misuse of her authority as a public employee and the violation, when Fine continued to act like the head coach of the Dazzlers in certain material respects. The district did not replace

Fine's position with any other coach for the remainder of the school year. The continuation of authority as head coach included sending a directive through a text message to a team member, Fine's sister, to "get everyone to 'boycot'" Sturdivant, a directive team parents and/or other members of the dance team followed. App. 315 - Order, p. 27.

F.    *Fine's May 3, 2018 Email to BVSD.*

Following the May 2, 2018 meeting, on May 3, 2018, Fine sent an email to Dr. Murphy and Nacole, sharing that that "she had time reflect about the events that have transpired." App. 234-35, Supp. App. 505-513 - 11:13-42:7. After the period of her reflection, Fine claimed to have been caught "completely off guard" at the May 2, meeting when she admitted to having wrote the text messages at issue, but had not had the opportunity to offer her version of the context of the racial slur which, Fine claimed, was "taken out of context." App. 235. While never retracking that the reference of "fucking black" was to Sturdivant, Fine claimed the slur was "taken out of context" and "had nothing to do with Camille, it was in regard to our friend Maggie. *Id.* If you would take a minute to read through it carefully, you will see that what I was saying was that the mutual friend that we knew (Maggie) did not make the team *because of the diversity protocol of this particular university*. *I didn't mean that Camille couldn't make it unless she had a particular skin color. I was saying that what I think was one of the most skilled dancers trying out didn't*

*make it because the school is known to have a diversity issue*.  I do see how Camille would be hurt if she read this, but it was never meant for her eyes.  It was simply two dance teachers talking in private about how the selection process doesn't always reflect the skills of the athlete.  ***This was taken out of context and used against me because I used a single word that made others uncomfortable***."  App. 234-35 – Supp. App. 505-513 - 11:13-42:7 (emphasis added).

Fine's portrayal of the University of Missouri as being "known to have a diversity issue," and that her Caucasian friend did not make the team "because of the diversity protocol" of that school is also belied by the record facts.  When Sturdivant tried out for the University of Missouri's "Golden Girls, she was one of only six black females who auditioned for the team, and Sturdivant was the only black selected.  App 219 - ¶¶ 23-24.  Sturdivant continues to be a member of the Golden Girls through her college sophomore year, having been selected again after tryouts for the 2020-21 school year.  App. 222 - ¶ 57.

## G.     *Fine's Directive to Boycott Sturdivant.*

After the meeting of May 2, 2018, Fine texted her younger sister, who was a member of the Dazzlers, directing her that she "get everyone to boycott" Sturdivant.  App 238.  Specifically, Fine's sister sent Fine a text message on May 2, 2018 in which she stated that Sturdivant had asked her to present flowers to her after the Spring Show — part of a tradition for graduating seniors.  According to the text

message, Fine's sister refused to present flowers to Sturdivant and Fine tells her, "You can't." The boycott directive follows in a separate text to her sister. The exchange reads as follows:

Sister:      Originally Camille asked me to give her flowers

Sister:      But I'm not gonna anymore.

Fine:        Nooooooo your [sic] joking?!?!?

Fine:        Did she unask you

Sister:      I mean no

Sister:      She never said anything

Sister:      But like I feel like she honestly thinks I'm doing it still but I'm not

Fine:        You can't.

**Fine:        Get everyone to boycot [sic].[4]**

App. 238; Supp. App. 516-17 – 55:9-61:17 (emphasis added). Fine's brief misleadingly combines the last above two lines of Fine's quoted boycott directive and takes out the period. Appellant's Brief at 5. The district court's Order quotes this message with two lines (instead of one), consistent with Exhibit P22. App. 238, App. 295 – Order, p. 7.

---

[4] Appellant, in its brief, materially mischaracterizes this statement as "You can't Get everyone to boycott(sic)." These are two separate statements. Fine said, "Get everyone to boycott(sic)." App. 238.

**H.** *__Deprivations of Educational Opportunities and Advantages to__*
*__Sturdivant Resulting from Boycott Directive.__*

Following the May 2, 2018 meeting with Fine and communications among team members and parents, some parents arrived at the conclusion that Fine had been punished because Sturdivant "took a racial comment and blew it out of proportion." Supp. App. 432 - 97:23-98:5. Some if not all the team parents came to the conclusion that Sturdivant and her parents were at fault and to blame for Fine's fate. App. 295 - Order, p. 7. The district court concluded that the evidence of the subsequent conduct by the Dazzlers and some Dazzlers parents supports the inference that Fine's directive to "Get everyone to boycott" was in fact, carried out. *Id.*

On May 3, 2018, the team parents decided to cancel the team's end of the year banquet that was scheduled to take place at BVNW on May 8, 2018, and replaced it with an off-school dinner for the purpose of including Fine and excluding Sturdivant. App. 296 – Order, p. 8.

On the evening of May 3, 2018, just before the first Spring Show performance scheduled later that evening, thirteen of fourteen Dazzlers met at the home of one of the team parents. App. 297 – Order. p. 9. Consistent with Fine's message to boycott Sturdivant, Sturdivant was not invited and purposefully excluded from the team meeting. App. 236, Fine Ex. 62; Supp. App. - 45:14-50:16. Fine, on the other hand, attended the team meeting, scheduled for the purpose of permitting the team – minus

its only Senior member, Sturdivant -- to bond and support each other before the Spring Show. *Id.* App. 297 – Order, p. 9; App. 219 – Sturdivant Declaration, ¶¶ 29-30. During the team meeting, Fine gave the Dazzlers – minus Sturdivant - a "pep talk" and "encouragement" about the show. Each year, Fine gave an inspirational talk before the Spring Show. App. 297 – Order, p. 9. The meeting in which Sturdivant was excluded was scheduled off premises for the purpose of permitting Fine to give the traditional motivational, supportive talk to the team to send them off to the start of the Spring Show. App. 219 - ¶¶ 29-30.

After the May 3, 2018, Spring Show evening performance, Fine exchanged text messages with a team mother. When Fine texted that she missed seeing the Dazzlers perform that evening, the mother responded: "Oh we know—and we all missed you SO much! There is not one family on our team who doesn't support you!! **(Minus the rat)**." (emphasis added). App. 246; Supp. App. 478-80 – 18:11-27:21. The mother admitted that her use of the word "rat" referred to Sturdivant and her family. *Id.* Fine said nothing in the text message in response to the mother's disparagement of Sturdivant as "the rat." App. 246.

On May 4, 2018, the last night of the Spring Show, all the Dazzlers except Sturdivant wore small purple ribbons with Fine's initials, "CF," on their costumes. A mother of one of the Dazzlers made the ribbons to recognize and honor Fine. Supp. App. 480 - 26:10-17.

Consistent with the "boycott" directive, during the entire Spring show, the other Dazzlers, except for the other black team member, ignored Sturdivant and would not speak to her. App. 231, Supp. App. 432, 97:24-98:2; Dep Ex. 33; App. 219, ¶¶ 25-30. Moreover, traditionally, at the final Spring show, one or more Dazzlers would present flowers to and make remarks to acknowledge the Dazzlers who are graduating seniors each year. App. 298- Order, p. 10, App. 220, ¶¶ 41-42. In 2018, that tradition was disregarded. That year, Sturdivant was the only Senior member of the Dazzlers. No member of the Dazzlers presented the traditional bouquet of flowers to Sturdivant at the end of the Spring show, to acknowledge Sturdivant as a departing Senior. *Id.* No member of the Dazzlers made any acknowledgment or other remarks about Sturdivant at the final show, as was the tradition. *Id.*

Pressly had assured Sturdivant's mother that Pressly would stay backstage during the Spring Shows to protect Sturdivant. Sturdivant, however, never once saw Pressly during the shows as promised. Fine's own mother, however, was backstage and her presence was uncomfortable for Sturdivant. App. 297 – Order, p. 9.

After the final Spring show, some of the Dazzlers mothers took photos of thirteen of fourteen members of the team. Sturdivant did not appear in any of the team photos. App. 297 – Order, p. 10.

On May 3, 2018, Melodie Sturdivant contacted Pressly to advise her that the team banquet had been cancelled and that she believed that other team parents were planning an off-school-property dinner. Supp. App. 317, Dep Ex. 31; App. 223, ¶1. At Pressly's request, Ms. Boan checked in with the team parents to see whether they were planning an alternative event and confirmed that to be true. A mother contacted by the District confirmed Fine would be attending. Supp. App. 613 - 88:19-89:17. Sturdivant was, in fact, excluded. Supp. App. 219-20, ¶¶ 31-37.

Following the boycott directive, the other Dazzlers except the other black team member, stopped speaking to Sturdivant at all. Prior to the time she found the text on Fine's phone and her parents complained about the text, the Dazzlers had been not only Sturdivant's teammates but her close friends, who had visited her house and attended sleepovers. App. 221 - ¶¶ 43-45. On Saturday, May 5, 2018, Melodie Sturdivant contacted Pressly to notify her that the other dancers were ostracizing and ignoring Sturdivant. She asked that Sturdivant be excused from her first-hour Dazzlers class for the remainder of the school year, which was essentially a study hall at that point because the Spring Show was over. Supp. App. 344 - 79:10-20; Supp. App. 432 - 98:6-21. Pressly excused Sturdivant from class. Sturdivant did not attend her first-hour class for the four days that remained in the school year for graduating seniors. Melodie Sturdivant, by this time, expected Ms. Pressly to inform the Dazzlers and their parents that Fine had "exhibited racial prejudice

against a dancer" in the hopes that the information would prevent the Dazzlers from further ostracizing and excluding Sturdivant, but this did not occur.  App. 223, ¶¶ 6-7.

On May 8, 2018, the night of the cancelled team banquet, Camille Sturdivant learned that the Dazzlers had gone to dinner together that evening without her.  Miss Sturdivant had seen photos of the Dazzlers on the Plaza in Kansas City, on social media.  All of the Dazzlers, except Sturdivant, had dinner together that evening, on the night of the previously scheduled team banquet.  Fine was present at the dinner, as were several team parents.  Supp. App. 370 - 183:17-184:9; App. 219, ¶¶ 31-37.

Following her high school graduation on May 12, 2018, Sturdivant held a graduation party and invited her teammates.  Consistent with the boycott directive, none of the Dazzlers attended the party, except the only other black member of the team.  The Dazzlers team members would not even speak to Sturdivant and ostracized her.  App. 49 – Order, p. 13; App. 220, ¶¶ 38-40, 43-45, 48.

In addition to the first-hour class, Dazzler team activities included regular participation in dance practices, school performances, dance competitions, team dinners and other activities, which took place both on-campus at BVNW High School and at off-site locations, including off-campus dinners, practice and other activities at various locations including Fine's personal dance studio.  App. 218 - ¶¶ 14-22.  The Dazzler coaches would always be present at such official Dazzler

off-campus activities.  App. 218-19 -  ¶  22.

## I.  *Damages to Sturdivant.*

As a result of the racial slur by her own Coach and the ostracism suffered resulting from the actions of Fine, Sturdivant suffered considerable humiliation, embarrassment, and emotional distress.  App. 221 - ¶ 51.  During the Spring Show, Sturdivant found it very hard to perform and had thoughts about quitting the show but resisted being forced to quit and preferring to end her high school dance career on her own terms.  It was difficult, especially on the May 4th show, to know that she would be walking into a dressing room where she would be ignored, that she would perform her senior solo and no teammates would be cheering for her, and to sit through her senior dedication and not have one team members turn around and look at her or hug her, simply based off of what Fine had shared with other team members. Sturdivant never felt so alone and so alienated in those two days of the Spring show, May 3 and 4, 2018, than ever before.  Sturdivant missed the last week of her first hour Dazzlers class due to the humiliation and altered relationship with other Dazzler team members.  Sturdivant has thought about and continues to think about what Fine and Murakami did to her daily.  App. 221-22 - ¶¶ 36-56.

# SUMMARY OF ARGUMENT

The district court properly denied summary judgment to Fine on qualified immunity based on Fine's conduct in referring to her student and member of the Dazzlers dance team as "fucking black," and then after hearing that Sturdivant and her parents had complained about the racist slur, in directing a boycott of Sturdivant, carried out by student team members and some of the Dazzler parents. As a result, Fine's actions excluded Sturdivant, based on her race, from educational benefits and opportunities as a member of her high school dance team. Fine did not exclude any of her non-black students from any of the benefits of the Dazzlers High School Team.

Fine engaged in the conduct that was violative of equal protection under color of state law and therefore met the requirement of liability of 42 U.S.C. § 1983. Fine was an employee on the BVSD payroll for the entirety of the 2017-2018 scholastic year which ended on May 24, 2018, during which the violative conduct occurred. Not only was Fine an employee of the school district during the relevant time, Fine abused her authority as an educator and coach to target Sturdivant for a boycott, while she continued to act as the high school dance coach using her actual and apparent authority over her students, who provided her with loyalty and obedience, continued to consider Fine as their coach, and engaged at least in some of the same coaching responsibilities and traditions, while intentionally excluding Sturdivant.

As a result of the ostracism and shunning that her team members engaged in as instigated by Fine, not only was Sturdivant excluded from team activities, Sturdivant no longer attended her first hour dance class for the last week of her Senior year of high school. Sturdivant continues to carry the pain of the racism and betrayal of her coach and team members to this day.

In defeating a defense of qualified immunity, not only must a Constitutional violation be demonstrated, the equal protection right claimed to have been violated under the particular facts of this case must also be clearly established under relevant law. A clearly established right is one that is `sufficiently clear that every reasonable official would have understood that what he is doing violates that right. Sturdivant also meets the second prong of the qualified immunity analysis.

As of 2018, all reasonable educators understood it to be illegal to intentionally exclude a black student from educational benefits and opportunities afforded non-black students in a school setting in violation of equal protection provisions of the Constitution. By 2018, *Ramirez v. Department of Corrections*, 222 F.3d 1238, 1341-44 (10th Cir. 2000), provided clear notice to Fine of the violative nature of her conduct through the application of the facts to an educational setting. In addition, for over 70 years, *McLaurin v. Oklahoma State Regents for Higher Education,* 339 U.S. 637, 639-40, 642 (1950), the directives of the Civil Rights Act of 1964, Title VI, and its regulations defining Title VI, 34 C.F.R. §§ 100.3(b)(1), provided clear

notice to Fine of the violative nature of her intentional conduct in excluding a black student from the advantages and opportunities enjoyed by her Caucasian students.

Because Sturdivant satisfies both prongs of the qualified immunity analysis, the district court's order denying summary judgment should be affirmed.

<u>**ARGUMENT**</u>

**I.  THE DISTRICT COURT PROPERLY DENIED DEFENDANT CARLY FINE'S MOTION FOR SUMMARY JUDGMENT BASED ON QUALIFIED IMMUNITY.**

This case involves intentional and heinous race discrimination by an educator, whose treatment of Sturdivant violated clearly established law under equal protection jurisprudence in both relevant employment and educational settings, thereby defeating any basis for qualified immunity.  When a defendant raises a qualified-immunity defense, the plaintiff must establish both (1) that the defendant violated a constitutional right and (2) the constitutional right claimed to be violated was clearly established at the time of the questioned conduct.  *Corona v. Aguilar,* 959 F.3d 1278, 1285-86 (10th Cir. 2020); *A.N. by and through Ponder v. Syling,* 928 F.3d 1191, 1196 (10th Cir. 2019); *Sh.A. v. Tucumcari Municipal School,* 321 F.3d 1285, 1287 (10th Cir. 2003).  As will be demonstrated, the district court correctly conclude that Sturdivant satisfied each of the required two prongs.

The purposes of qualified immunity include the protection of "public officials who act in good faith, on the basis of objectively reasonable understandings of the law at the time of their actions, from personal liability on account of later-announced, evolving constitutional norms."  *Pierce v. Gilchrist,* 359 F.3d 1279, 1299-1300 (10th Cir. 2004).  As explained by the Supreme Court, "Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise

power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). Qualified immunity provides a broad swath of immunity protection to public officials intended to include "all but the plainly incompetent or those who knowingly violate the law." *Mullinex v. Luna,* 136 S.Ct. 305, 308 (2015); *White v. Pauly,* 137 S.Ct. 548, 551 (2017).

Despite its admitted breadth, the reach of qualified immunity does not extend to Fine's conduct in this case intentionally excluding a black student from educational benefits and opportunities on the basis of her race while acting under color of state law. The district court's denial of summary judgment to Fine should be affirmed.

### A.  Standard of Review and Jurisdiction.

Interlocutory appellate review of the summary judgment denial of qualified immunity is de novo with respect to the legal issues presented. The Circuit views the evidence as the district court was required to in ruling on the summary judgment motion -- in the light most favorable to Sturdivant, as the non-moving party. *Mglej v. Raymond Gardner,* 974 F.3d 1151, 1159 (10th Cir. 2020) (citing to *Plumhoff v. Rickard,* 572 U.S. 765, 768, 134 S.Ct. 2012, 2017, 188 L.Ed.2d 1056 (2014)); *Sh.A. v. Tucumcari,* 321 F.3d at 1287.

The denial of qualified immunity to a public official is immediately appealable but only to the extent the appeal involves abstract issues of law. *Sawyers v. Norton*, 962 F.3d 1270, 1281 (10th Cir. 2020) (quoting *Fancher v. Barrientos*, 723 F.3d 1191, 1198 (10th Cir. 2013); *Mitchell v. Forsyth*, 472 U.S. 511, 530, 105 S.Ct. 2806 (1985). At the summary judgment stage, a circuit court "lacks jurisdiction…to review a district court's factual conclusions, such as the existence of a genuine issue of material fact for a jury to decide, or that a plaintiff's evidence is sufficient to support a particular factual inference." *Fancher*, 723 F.3d at 1199 (quotations omitted); *Johnson v. Jones*, 515 U.S. 304, 307, 313, 315-18, 115 S.Ct. 2151 (1995); *Mglej,* 974 F.3d at 1159.

The Circuit "must scrupulously avoid second-guessing the district court's determinations regarding whether [the appellee] has presented *evidence* sufficient to survive summary judgment." *Fancher,* 723 F.3d at 1199 (quotations omitted). The "universe of facts" upon which the circuit court bases the legal review of the propriety of denying qualified immunity includes those facts explicitly found and the reasonable inferences assumed and likely assumed by the district court. *Brown v. Flowers,* 974 F.3d 1178, 1182, 1184 (10th Cir. 2020); *Cox v. Glanz,* 800 F.3d 1231, 1242 (10th Cir. 2015); *Sawyers,* 962 F.3d at 1281.

**B. Fine Violated Her Student's Equal Protection Right Not to Be Excluded from the Educational Benefits and Opportunities Based on Race.**

Sturdivant meets the first prong of the two-part test through facts that support her claim that Fine acted under color of state law when she used her actual and apparent authority as a high school coach to incite and carry out a boycott by her students and their parents of Sturdivant, based on her student's race, causing Sturdivant to be excluded from the full enjoyment of the educational benefits and opportunities of her public high school dance team enjoyed by non-black team members. The elements of Sturdivant's equal protection claim include:

1) intentional unequal treatment of Sturdivant by Fine; 2) based on race; and 3) committed while under the color of state law. *Nieto v. Kapoor,* 268 F.3d 1208, 1215-20 (10th Cir. 2001); *Jojola v. Chavez,* 55 F.3d 488, 492-94 (10th Cir. 1995); *Ponder,* 928 F.3d at 1196; *Ramirez v. Department of Corrections*, 222 F.3d 1238, 1243-44 (10th Cir. 2000). In race discrimination cases, the elements of the plaintiff's case remain the same whether the case is pursued under §§ 1981 or 1983 or Title VII. *Baca v. Sklar,* 398 F.3d 1210, 1218 n. 3 (10th Cir. 2005), a conclusion the district court also reached. App. 310 – Order, p. 23.

The Fourteenth Amendment to the United States Constitution commands that "[n]o state shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amendment XIV, § 1. The Equal Protection Clause is

"essentially a direction that all persons similarly situated should be treated alike."
*City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985); *Requena v. Roberts*, 893 F.3d 1195, 1210 (10th Cir. 2018); *Ramirez,* 222 F.3d at 1243-44. Redress under 42 U.S.C. § 1983 for denials of equal protection based on race or sex undeniably apply to state officials acting under color of state law in public educational settings. *Murrell v. School District No. 1, Denver, Colorado,* 186 F.3d 1238, 1250-51 (10th Cir. 1999); *Doe v. Hutchinson*, 728 Fed. Appx. 829, 832 (10th Cir. 2018) (unpublished) (Addendum, 23-27). Violations of federal law under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq,* have been "routinely interpreted to allow for parallel and concurrent § 1983 claims." *Fitzgerald v. Barnstable School Committee,* 129 S.Ct. 788, 797, 555 U.S. 246 (2009).

The district court found that sufficient evidence existed to support each of the three elements of Sturdivant's claim, including that Fine treated Sturdivant differently than non-Black members of the Dazzlers based on her race, Sturdivant suffered deprivations of educational benefits and opportunities and Fine committed the violations while acting under color of state law. App. 319 – Order, p. 31. In this appeal, Fine significantly dilutes the evidence presented in the summary judgment record and invites second guessing of the district court's conclusions. The district court bluntly pointed out that Fine refused to "come to grips with the thrust of plaintiff's claim against Fine – the defendant's 'fucking black' text followed by

her 'boycott' directive set in motion various events that deprived plaintiff of the full benefit of her participation on the school-sponsored Dazzlers, beginning with the May 3, 2018 meeting and culminating in the last week of school when plaintiff stopped attending her first-hour class because the Dazzlers had ostracized her." App. 312 – Order, p. 24. In this appeal, Fine continues her failure to reckon with the summary judgment facts supporting Fine's equal protection violation.

***Racial Motivation.*** Fine simply ignores the bulk of evidence and reasonable inferences from such evidence showing that her racial bias motivated her actions in this case. Astonishingly, Fine's Appellant Brief never once even specifically refers to all or even part of the words in Fine's text message, much less quotes, her "fucking black" reference to Sturdivant she shared with the dance choreographer, Murakami. In an obvious attempt at whitewashing, Fine's brief only off-handedly refers to her racial slur as a "regrettable statement." Appellant's Brief, at 4. Fine's alleged "regret" expressed in this litigation is also belied by her May 4, 2018 words, claiming she "…100% did not do anything wrong." App. 240 – Dep Ex. 66; Supp. App. 519-521 – 55:9-61:17.

Fine offered no non-discriminatory reason for any of her conduct, racial slurs or other racially demeaning words used about Sturdivant in her summary judgment response nor in this appeal. Instead, Fine attempts to distract the court's attention with her own viewpoint that she is the wronged victim of a violation of her alleged

privacy rights, painting herself as the victim, instead of her black student she targeted for a boycott and ostracism.[5]  Fine entirely omits that she regularly shared her password with the Dazzlers' dance team to allow the students access to the music used for dance routines.  Sturdivant only discovered the texts when two Sophomore students who were searching for music handed it to her for assistance.  Thus, Fine's claim of privacy fails in addition to being irrelevant.  Even apart from any claim of privacy, had Fine written the racial slur in a private diary, the fact remains the words were those intentionally chosen by Fine concerning her black student, and would not alter the racial bias the words reflect.  The fact that Fine shared the words with the Dazzlers' dance choreographer only demonstrated the level of comfort she felt in sharing the racial slur of a student with a known ally likely to respond with a laughing emoji rather than exposing or calling out her racial bias to her employer.[6]

On May 3, 2018, Fine attempted to redeem herself with her employer, but only slid further into the racial cesspool she herself created, with further dog

---

[5] Fine's reaction to the allegations of racially derogatory treatment of Sturdivant attempts to paint herself as the victim of various wrongs, as opposed to the student she victimized with racial swear words, followed by a directive to boycott the student. Fine's reaction bears strong resemblance to the defensive tactics described as "White Woman's Tears" in  White Fragility, by Robin Diangelo, Chapter 11.

[6] Moreover, in 2016, Murakami had expressed to Sturdivant that the dance team's costume color would clash with Sturdivant's skin color, while Fine stood silent and failed to utter any word in her student's defense.  App. 217-18-¶¶5-11; App. 290-92 – Order, pp. 2-4.

whistles. In an email to SMSD, Fine illogically claimed referring to Sturdivant as "fucking black" had nothing to do with Sturdivant, but instead, only concerned both Fine and Murakami's sympathies for the non-selection of their mutual friend (a Caucasian) because of, according to Fine and Murakami, "the diversity protocol of this particular university," and that the unnamed school (the University of Missouri) was "known to have a diversity issue." App. 235. Fine's perception that the University of Missouri chose Sturdivant because of its "diversity protocol" was belied by actual evidence that of the six blacks who auditioned, Sturdivant was the only black selected as a Missouri "Golden Girl." App. 219 - ¶¶23-24.

No evidence ever suggested that Fine treated any other non-black student in the manner she treated Sturdivant. Fine argues without legal support that Sturdivant must produce evidence that the only other black Dazzler was also a victim of Fine's racial discrimination or bias, a point the district court correctly rejected. App. 309 – Order, p. 21. The law has long recognized that evidence of non-discrimination against some members of a minority group does not exonerate the discriminatory treatment of a plaintiff based on an illegal motive. *Connecticut v. Teal,* 447 U.S. 440, 455 (1982); *Pitre v. Western Electric Company, Inc.,* 843 F.2d 1262, 1273 (10th Cir. 1988).

The district court also correctly rejected Fine's argument that because Sturdivant did not assert a claim for retaliation, Fine's retaliatory conduct following

the report of the racial slur should be disregarded in evaluating her equal protection discrimination claim. In *Jackson v. Birmingham Board of Education,* 544 U.S. 167, 173-74 (2005), the Court makes clear that retaliation is a form of discrimination. The district court correctly pointed out that a jury may view evidence that Fine targeted Sturdivant following her complaint objecting to the "fucking black" text message as evidence supporting the conclusion that her unequal treatment of Sturdivant was based on her race. *Id.*

*Adverse Action.* In addition to the ample evidence supporting the conclusion that racial bias motivated Fine's actions, the district court's conclusion that Sturdivant's evidence and reasonable inferences from such evidence established an adverse action by Fine was amply supported by record evidence.[7] Fine directed her sister, also a Dazzler, to "get everyone to boycot [sp]" Sturdivant. App. 238 – Supp. App. 518-19 - 55:9-61:17. Fine's directive set in motion the intentional exclusion of Sturdivant from a team meeting attended by Fine before the first night of the two night Spring show, a meeting traditionally held for the coach to provide inspiration and encouragement to the team immediately before the Dazzlers' performances. A jury could infer the exclusion of Sturdivant and presence of Fine at the team meeting

---

[7] The district court pointed out that the parties both agreed, consistent with case authority, that proof of an adverse action in the form of a deprivation of an educational benefit or opportunity was part of Sturdivant's equal protection claim under § 1983. App. 311 – Order, p. 23.

was pre-meditated and intentional. App. 236; Supp. App. 515-16 – 45:14-50:16 (text message discussing plan to invite team members (minus Sturdivant), "without fanfare," and that Fine will "just happen to be stopping by to the team meeting"). Fine's directives to boycott Sturdivant resulted in ostracism by team members during the two day Spring show, and after the final performance, team members refused to acknowledge Sturdivant as a graduating senior with the traditional flowers or speak about her as a graduating Senior, consistent with the tradition of saying farewell and extending good wishes, at the end of the show. Sturdivant was excluded from team photographs taken after the Spring Show. While ignoring Sturdivant's presence throughout the two-day show, the remaining students wore ribbons during final performance in support of Fine. Fine's directives to boycott Sturdivant resulted in Sturdivant being labelled a "rat,"[8] and being called a "fucking bitch,"[9] suffering blatant ostracism from her teammates at school, both before and after the Spring performances. The boycott directive spilled into the school environment and further resulted in the exclusion of Sturdivant from the annual team dinner arranged off-premises and attended by Fine, to which Sturdivant was not invited.

---

[8] App. 246; Supp. App. 478-80 - 18:11-27:21.

[9] App. 241, Dep. Ex. 69; Supp. App. 522-23 – 71:9-74:10.

Fine also entirely omits that Sturdivant was forced to no longer attend her study hall in the last four days of her Senior school year because she was being shunned by her Dazzlers teammates, a study hall that comprised part of her educational curriculum. Teammates who had previously been close friends, previously visiting their mutual homes, would no longer speak with her or acknowledge her presence. No Dazzler, except the other black team member, attended Sturdivant's graduation party. In short, the district court correctly determined that sufficient evidence supported this element of the claim. App. 311 – Order, p. 23. *See Bryant v. School Dist. of Garvin City, Ok.,* 334 F.3d 928, 932-34 (10th Cir. 2003) and 34 C.F.R. § 100.3(b)(1)(i)-(vii) (Addendum, 1-22). The court's jurisdiction does not extend to re-visiting the court's conclusions. *Mitchell*, 472 U.S. at 530.

**Color of State Law.** Ample evidence also supported that Fine acted under color of state law while committing the equal protection violation. A plaintiff may satisfy this prong of a § 1983 claim through evidence that the state official was an employee of the government entity and further, that the conduct causing the deprivation of the constitutional right is fairly attributable to the State. *Jojola v. Chavez,* 55 F.3d at 493; *Gallagher v. Neil Young Freedom Concert,* 49 F.3d 1442, 1447 (10th Cir. 1995). The district court correctly concluded that Sturdivant met both of such prongs of this element.

Initially, Fine simply omits Sturdivant's evidence that Fine's employment with BVSD, without dispute, continued until the remainder of the 2017-2018 scholastic year. App. 313 – Order, p. 25. Fine relies upon her broad and self-serving reading of a stipulation in the Court's Pretrial Order, App. 39 - Pretrial Order, ¶ 4, while Sturdivant's factual contentions expressly made clear that Sturdivant had not stipulated that Fine's employment was terminated on May 2, 2018 nor at any other time before her employment contract terminated at the end of the 2017-2018 school year. App. 47, at 11 ("On May 2, 2018, Dr. Pressley and Dillon met with Fine and suspended her from working further with the Dazzlers on campus. **Fine was not terminated**, just told her contract had been completed and she was paid completely. She was told she could not come to the spring show scheduled for May 3 and 4 and she was not to be on campus." (emphasis added)). That Fine was, in fact, **not terminated** was a fact expressly communicated to Fine as a result of her own email inquiry to BVSD authorities about the status of her employment following the May 2, 2018 meeting. App. 233, Supp. App. 507-15 – 11:13-42:7. As noted by the district court, BVSD did not replace Fine's position with any other coach for the remainder of the school year.

Ample evidence, along with reasonable inferences expressly made by the district court, also supported the conclusion that the conduct engaged in by Fine was fairly attributed to the state. App. 314-15 – Order, pp. 25-26. For conduct to be

fairly attributed to the state as actions under color of state law, there must be evidence supporting a "real nexus" between Fine's use or misuse of her authority and her actions as she continued to invoke her authority in the capacity of a head coach of the Dazzlers while continuing on the BVSD's payroll. *Jojola,* 55 F.3d at 493. The authority that is used or misused may be either actual or apparent. *Id.* (citing *Griffin v. Maryland,* 378 U.S. 130, 135, 84 S.Ct. 1770, 1772-73, 12 L.Ed.2d 754 (1964)). Further, even where violative conduct is not expressly authorized or even prohibited by the state, the conduct may still have been taken under color of state law. *Jojola,* 55 F.3d at 493. *See Doe v. Fournier,* 851 F. Supp. 2d 207, 220-21 (D. Mass. 2012); *Doe v. Hutchinson, supra.*

Armed with the knowledge that her employment had not been terminated, she would remain on the district payroll for the remainder of the school year and that there were no restrictions on her future employment with BVSD, Fine proceeded to instruct another team member to get the team to boycott Sturdivant, to demean Sturdivant further based on her race in text messages and emails, intentionally exclude Sturdivant from a team meeting immediately before the first night of the Spring Show, intentionally exclude Sturdivant from the annual banquet, and set in motion and encourage the ostracism and shunning of Sturdivant by team members and parents that resulted in Sturdivant's exclusion from the last week of attendance at her first hour Dazzler class. The district court found the evidence showed Fine

continued to invoke her authority as the head coach, attending a team meeting where she acted as the head coach in delivering her traditional inspirational speech before the Spring Show and attending an annual team banquet, and was continued to be viewed by her team and team parents as the head coach. Fine also continued regular communications with the Dazzlers and their parents following the May 2, 2018 meeting. The continuation of Fine's authority as head coach included sending a directive through a text message to a team member, Fine's sister, to "boycot" Sturdivant, a directive team parents and/or other members of the dance team followed based on their view of Fine's authority. "In sum, a jury could find that Fine, while under contract with the District, misused her apparent authority as the head coach of the Dazzlers to cause injury to plaintiff such that requisite nexus exists to support a finding that Fine acted under color of state law." App. 315 – Order, p. 27.

In summary, the evidence and reasonable inferences from the facts presented in summary judgment establish an equal protection violation committed under color of state law.

## C.    <u>Fine Violated Clearly Established Law.</u>

Fine also meets the second prong of the analysis. By 2018, any reasonable educator would understand that a high school coach directing a boycott of a black student based on race, whom the educator refers to as "fucking Black," resulting in

the deprivation and exclusion of educational benefits and opportunities to the student, is beyond debate as within clear contours of equal protection laws prohibiting unequal treatment by public officials of employees and students based on race, in the contexts of both public employment and public education settings. *Ramirez,* 222 F.3d at 1243-44; *McLaurin v. Oklahoma State Regents for Higher Education,* 339 U.S. 637, 639-40, 642 (1950); *Doe v. Hutchinson*, 728 Fed. Appx. at 832; Title VI of Civil Rights Act, 42 U.S.C. §§ 2000d, *et seq.,* 34 C.F.R. § 100.3(b)(1)(i)-(vii) (broadly defining prohibited discriminatory actions for purposes of Title VI race discrimination in public schools). Once the plaintiff demonstrates a clearly established constitutional right, a qualified immunity defense generally fails "since a reasonably competent public official should know the law governing his conduct." *Cannon v. City & County of Denver,* 998 F.2d 867, 870-71 (10th Cir. 1993).

To support the denial of qualified immunity, Sturdivant's right to educational benefits or opportunities free from racial discrimination under the Equal Protection Clause must be a clearly established right. "A clearly established right is one that is `sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Corona v. Aguilar,* 959 F.3d at 1285-86 (quoting *Mullinex v. Luna,* 136 S.Ct. at 308). *See also Anderson v. Creighton,* 483 U.S. 635, 640 (1987) (The contours of the constitutional right must be sufficiently clear that

a reasonable official would understand that what he is doing violates that right). "This is not to say that an official action is protected by qualified immunity unless the very action in question has been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent." *Hope v. Pelzer*, 536 U.S. 730, 739, 741, 122 S.Ct. 2508 (2002). A substantial correspondence between the conduct in question and prior law establishing that the defendant's actions were clearly prohibited must be demonstrated. The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violated that right. *Anderson, supra.* The inquiry is "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than a requirement to engage in "a scavenger hunt for cases with precisely the same facts." *Pierce v. Gilchrist*, 359 F.3d a t 1297-99.

A plaintiff can demonstrate that a right is clearly established "by reference to cases from the Supreme Court, the Tenth Circuit, or the weight of authority from other circuits." *Gann v. Cline*, 519 F.3d 1090, 1092 (10th Cir. 2008). Although a court may not define clearly established law at a high level of generality, a case directly on point is also not required. *Mullinex v. Luna,* 136 S.Ct. 305, 308 (quoting *Ashcroft v. al-Kidd,* 563 U.S. 731, 741-42, 131 S.Ct. 2074 (2011) (explaining that the right must be "*sufficiently clear* that every reasonable official would have understood that what he [or she] is doing violates that right" (emphasis added)). The

Tenth Circuit has also held that a specific "case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law…" *Kerns v. Bader*, 663 F.3d 1173, 1186 (10th Cir. 2011).

Moreover, even in novel circumstances, a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question to satisfy the second element. *Hope v. Pelzer,* 536 U.S. at 741. *See A.N. by and through Ponder,* 928 F.3d at 1196. Applying these standards leads to the conclusion that the second prong of the qualified immunity analysis has been met in at least two ways.

1. ***Ramirez v. Department of Corrections***. The district court correctly found that *Ramirez v. Department of Corrections, supra,* provided clear notice to Fine, by 2018, of the illegality of the exclusion of a student through a boycott from educational benefits and opportunities, based on race, supporting the constitutional violation alleged by Sturdivant. In *Ramirez,* the Hispanic plaintiff's Complaint alleged that the Director of Community Corrections routinely denied Hispanics of Mexican-American descent, along with Ramirez, permanent supervisory positions and the ability to function as lead workers, a promotion to a position intended to prepare and open up future promotional opportunities. 222 F.3d at 1241-42. The defendant asked Ramirez whether he was a U.S. citizen and subjected him to false accusations in an effort to unjustly discipline him, in contrast to non-Hispanic

employees, who were not questioned about their citizenship nor singled out for disciplinary action. *Id.*

Fine's primary argument for reversal of the district court is her claim that "*Ramirez* does not share particularized facts with the facts alleged by Plaintiff . . .," as required by *White v. Pauly, supra,* and other Supreme Court cases, to be considered as the basis for clearly established law. Appellant Brief at 7. As an initial matter, Fine's argument fails because she reads *White v. Pauly* too broadly in the context of an equal protection case. The directives in *White v. Pauly,* must be examined in light of the context of the Fourth Amendment analysis and further, in a reasonable force case expressly recognized as involving a unique set of facts and circumstances.[10] *Pauly,* 137 S.Ct. at 552. In determining whether a right is defined with sufficient specificity for purposes of qualified immunity analysis, the specific context of the case is required to be taken into consideration. *Brosseau v. Haugen,* 543 U.S. 194, 198 (2004) (quoting *Saucier v. Katz,* 533 U.S. 194, 201 (2001), *overruled on other grounds by Pearson v. Callahan,* 555 U.S. 223 (2009)). In some cases—such as those "in the Fourth Amendment [excessive-force] context"

---

[10] In *White,* the Court expressly frames the issue presented in a narrow manner that is a far cry from the facts in this case -- the "situation of an officer who – having arrived late at an ongoing police action and having witnessed shots being fired by one of several individuals in a house surrounded by other officers – shoots and kills an armed occupant of the house without first giving a warning." *Pauly,* 137 S.Ct. at 549, 552.

dealing with the "hazy border between excessive and acceptable force" – specificity is especially important." *Mullinex,* 136 S.Ct. at 308, 312.

The parameters and contours of the law addressing the use of deadly force under Fourth or Eighth Amendment jurisprudence has been described in particular as one that is often "blurry" or evaluated under the standards of reasonableness of conduct undertaken under existent and dangerous circumstances. The contours of an equal protection case dramatically differ. *Compare Ponder v. Syling*, 928 F.3d at 1196-97 (pointing out that the concerns underlying the recognition of qualified immunity are "particularly acute" in Fourth Amendment cases) with *Brown v. Flowers,* 974 F.3d 1178, 1184-86 (10th Cir. 2020) (rejecting the argument that the plaintiff must produce a case directly on point to inform a jail guard that the sex engaged in with a female inmate under the particularized circumstances in the case was non-consensual, or a case showing that a reasonable officer in the defendant's position would know that the specific conduct at issue amounted to sexual abuse, pointing out that case law does not distinguish between physical and non-physical coercion and any reasonable officer would understand the illegality of the conduct). *See also Contreras v. Dona Ana County Board of County Commissioners,* 965 F.3d 114, 1135 (10th Cir. 2020) (specificity of prior law with particularized facts most salient in Fourth Amendment context, and particularly true in excessive force cases); *Mullinex,* 136 S.Ct. at 308.

*White v. Pauly* also tempered its directives about the necessity for prior case law with particularized facts, by making clear that the unique circumstances present in *White* placed it outside of the cases "where it is obvious that there was a violation of clearly established law," citing to two Fourth Amendment cases where the parameters of the law were clearly established without the rigorous requirement of prior case law with particularized facts required in its own holding applicable to its facts. *White,* 137 S.Ct. at 552.

Since the Court's decision in *White v. Pauly,* in *A.N. v. Ponder,* 928 F.3d at 1198, this Circuit distinguished the application of the qualified immunity analysis set forth in *White v. Pauly* and *Mullinex v. Luna* in the context of a case involving an equal protection constitutional right, pointing out the Court's temperance of its holding in *White* where an obvious violation of clearly established law exists. 928 F.3d at 1197. In *A.N.,* the plaintiff alleged an equal protection violation by state officials who publicly released the name, charges and other information regarding the arrest of a juvenile, in violation of state laws, differentiating between similarly situated juvenile arrestees over and under the age of sixteen. 928 F.3d at 1196-97. In addressing the defendant's argument in *A.N.* – similar to the argument urged by Fine -- that the "clearly established" prong demands rigorous specificity from prior case law, the Tenth Circuit differentiated between the need for specificity of prior case law that "is particularly acute in Fourth Amendment cases," 928 F.3d at 1197-

98, while finding that a more specific case was not needed to establish an equal protection right, citing to *Hope v. Pelzer,* 536 U.S. at 741. *A.N.,* 928 F.3d at 1197-98. As reasoned by *Hope,* in cases outside the context of the Fourth Amendment, such as the facts in *A.N.,* "[g]eneral statements of the law can clearly establish a right for qualified immunity purposes if they apply with obvious clarity to the specific conduct in question." And this is so "even though the very action in question has not previously been held unlawful." *Hope,* 536 U.S. at 741, 122 S.Ct. 2508; *A.N.,* 928 F.3d at 1199.

In Sturdivant's case involving a claim of violation of equal protection based on race discrimination, an employer's denial of promotional opportunities to an employee based on race, such as that addressed in *Ramirez,* is not Constitutionally dissimilar to Fine's denial of her student's educational benefits and opportunities based on race. Such a conclusion is further confirmed in light of clearly established law recognizing parallel claims for race discrimination cases under both Title VI or Title VII to be pursued under § 1983. *Fitzgerald,* 129 S.Ct. at 797. Thus, the fact that *Ramirez* arose from an employment setting does not render the facts of *Ramirez* as materially dissimilar to the facts of Sturdivant's equal protection claim. Case authority establishing equal protection claims in public ***employment*** settings has been recognized as also providing clearly established law in the context of educational settings involving discrimination against students. *Sh.A. ex rel. J.A. v. Tucumcari*

*Mun. Schs*, 321 F.3d at 1289 (10th Cir. 2003); *Murrell v. School Dist.,* 186 F.3d at 1250-51; *Doe v. Hutchinson,* 728 Fed. App. at 835. In both *Sh.A.* and *Murrell,* the Tenth Circuit expressly rejected the defendant's argument that the lack of case law specifically addressing an equal protection claim arising from sexual harassment in an educational setting entitles him to qualified immunity, affirming the district court's ruling that employment law could be referenced as clearly establishing that the teacher was not entitled to qualified immunity in an educational setting. *Sh.A.,* 321 F.3d at 1289; *Murrell,* 86 F.3d at 1250-51. In readily rejecting such a narrow focus, *Murrell* reasoned, "This argument carries the concept of 'clearly established' to an extreme we decline to adopt. We have never said that there must be a case presenting the exact fact situation at hand in order to give parties notice of what constitutes actionable conduct. Rather we require parties to make reasonable applications of the prevailing law to their own circumstances." *Murrell,* 186 F.3d at 1251.[11]

---

[11] Arguably, the unconstitutionality of intentionally treating similarly situated persons differently based on race in violation of equal protection is clearly established and even, beyond dispute, as evidenced by this Circuit's decision not to even address the second prong, while affirming the district court's denial of qualified immunity in an unpublished decision. *Townsend-Johnson v. Cleveland,* 894 Fed.Appx. 833 (10th Cir. 2012) (unpublished) (affirming denial of qualified immunity for race discrimination under 42 U.S.C. § 1983). (Addendum, 28-31)

The reasoning in *Sh.A.* and *Murrell* applies with equal, if not greater force here, in light of the existence of additional detailed prohibitions applicable to educational institutions under Title VI and its implementing regulations, 34 C.F.R. § 100.3(b)(1)(i)-(vii), and recognized as the basis for an equal protection claim under § 1983. *Fitzgerald,* 129 S.Ct. at 797. Under Title VI, race discrimination claims against educational institutions not only include the denial of the benefits of a particular school program but also, include discriminatory actions that "[r]estrict an individual in any way in the enjoyment of any advantage or privilege enjoyed by others…under the school system." *Zeno v. Pine Plains Central School District,* 702 F.3d 655, 666 (2d Cir. 2012) (quoting 34 C.F.R. §100.3(b)(1)). Thus, the reasonable notice demanded in the qualified immunity analysis in the context of an equal protection violation in an educational setting is satisfied through the application of *Ramirez* to Fine's conduct in inflicting a boycott that includes exclusion of a student from the benefits of her high school dance team based on her student's race.

*2*. ***McLaurin v. Oklahoma State Regents for Higher Education.*** In addition to the district court's reliance on *Ramirez*, the Supreme Court has long condemned as a violation of equal protection exclusions and unequal treatment of persons based on race from educational benefits and advantages extended to non-blacks. In concrete terms applicable to the facts of this case, over 70 years ago, in *McLaurin v. Oklahoma State Regents for Higher Education,* the Supreme Court held

it to be a violation of equal protection to require a black graduate school student to sit apart from class members who were Caucasian, at designated places while in the classroom, library and reading room, and to eat at different meal times than Caucasian students while in the cafeteria. 339 U.S. at 639-40 and 642. In this case, Fine resurrected an attitude all reasonable educators would understand has been clearly pronounced to be illegal, and indeed thought to be dead, decades before 2018 – that equal protection law forbids a teacher from directing her students to boycott and exclude a black fellow student from the receipt of educational benefits and opportunities based on race.

The fact that a single educator – Fine, in 2018 – rather than a school policy, as in *McLaurin*, almost seventy years earlier in 1950 – led to the exclusion of the student from educational benefits and opportunities, based on race, does not alter the clarity of the contours of the conduct violative of equal protection. The appropriateness of the comparison of the facts of this case to those in *McLaurin* is illustrated in *Billings v. Madison Metropolitan School District,* 259 F.3d 807, 813-14 (7th Cir. 2001). In *Billings,* the Seventh Circuit affirmed the summary judgment denial of qualified immunity to a teacher who intentionally used race-conscious seating arrangements – a "buddy system" -- only for black and minority statements, because of the teacher's stereotyped view that minorities "view things in a global manner." 259 F.3d at 814. *Billings* found the "buddy system," although uniquely applied in the

classroom at hand, in its essence, to be "a form of race-based seating that has been condemned by the Supreme Court as long ago as its decision in *McLaurin v. Oklahoma State Regents…" Billings,* 259 F.3d at 816-17. Finding *McLaurin* applicable*,* the Circuit found clearly established law, reasoning that a public-school educator ought to have known of these well-established restrictions on the use of race as a criterion for use of a "buddy system" based on a stereotypical generalization about African-American children. 259 F.3d at 816-17. Likewise, in this case, the holding of *McLaurin* should be recognized as not merely a statement of general law, but a holding providing clear application and fair notice of the illegality of Fine's conduct. *Mullinex,* 136 S.Ct. at 308; *Hope v. Pelzer,* 536 U.S. at 741; *A.N.,* 928 F.3d at 1196.

As in *Billings,* the prohibition long articulated in *McLaurin* provided clear notice to Fine that her actions to exclude Sturdivant from the full educational benefits and opportunities of her high school dance program based on her expressed racial bias against Sturdivant would subject her to liability.

Since at least 1989, Tenth Circuit cases also provided clear notice to Fine that race discrimination under color of state law violates equal protection and subjects the state actor to liability under 42 U.S.C. § 1983. *See Fitzgerald*, 129 S.Ct. at 797; *Starrett v. Wadley*, 876 F.2d 808, 814 (10th Cir. 1989); *Bryant v. Independent School District,,* 334 F.3d at 931-33. This same principle is recognized by other circuits and

embodied in Title VI regulations, 34 C.F.R. § 100.3(b)(1)(i)-(vii). *See Heyne v. Metropolitan Nashville Pub. School,* 655 F.3d 556, 571 (6th Cir. 2011) (equal protection violated where a code of conduct is enforced more stringently based on race); *Buchanan v. City of Bolivar, Tenn.,* 99 F.3d 1352, 1360 (6th Cir. 1996) (discriminatory enforcement of school policies and practices violates well-established equal protection right to not be discriminated against in the school setting).

No reasonable educator could seriously feign ignorance of the obligations applicable to educators not to intentionally deprive their students of educational benefits or opportunities based on race under the law applicable to educators, including Title VI, its implementing regulations under 34 C.F.R. § 100, and Supreme Court law of 70 year vintage. Only by ignoring history and turning principles of racial equality on their head would any reasonable educator conclude that intentionally treating a student differently based on race would not subject him or her to liability. In 1866, amid backlash from passage of the "Reconstructionist Amendments," – the Thirteenth, Fourteenth and Fifteenth Amendments to the Constitution – Congress passed the Klu Klux Klan Act, which was codified as 42 U.S.C. § 1983. Since its passage in 1964, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d has prohibited unequal and discriminatory treatment of students based on race in the provision of educational benefits and opportunities. Eight years after passing Title VI, in 1972, Congress passed Title IX with the explicit

understanding that it would be interpreted as Title VI, which like Title VI, "routinely" allowed for claims under § 1983. *Fitzgerald,* 129 S.Ct. at 797.

Nor is the holding of *McLaurin* a mere general statement of the law incapable of providing clear or fair notice of the illegality of Fine's conduct. Fine's arguments demanding prior case law from a successful scavenger hunt identically matching each of the facts supporting the equal violation she committed ignores the fact that under her argument, the most obviously unconstitutional conduct would be the most immune from liability only because it is so flagrantly unlawful that few dare its attempt, or at the very least challenge it on appeal. *Contreras v. Dona Ana County Board of County Commissioners,* 965 F.3d at 1122. The purpose of qualified immunity does not include the protection of knowing violations of the law, and it would be an absurd result to give shelter to conduct so outrageous it is obviously unconstitutional, especially in the context of an equal protection violation. *Id.* The reasoning in *Contreras* applies equally here to Fine's equal protection violation. *See also Pierce,* 359 F.3d at 1298 (rejecting the defendant's attempted distinctions that the prohibition on falsification or omission of evidence, knowingly or with reckless disregard for the truth, in the context of information supplied to support an arrest warrant provided sufficient notice in the context of the omission or falsification of evidence in the post-arrest stage, reasoning, "[t]here is no moral, constitutional, common law, or common sense difference between providing phony evidence in

support of an arrest and providing phony evidence in support of continued confinement and prosecution….an official…. could not have labored under any misapprehension that the knowing or reckless falsification and omission of evidence was objectively reasonable." 359 F.3d at 1298. Fine's various attempted distinctions from either *Ramirez* or *McLaurin* also suffer from the lack of any moral, constitutional or common-sense differences.

Fine's failure to come to grips with the theory of Sturdivant's equal protection claim against her, as noted by the district court, should not be mistaken with any valid basis to argue a lack of clearly established law supporting the violation under the facts of the case. Fine contorts the evidence supporting Sturdivant's asserted equal protection violation, ignoring the standard of review on appeal and material fact issues resolved in favor of Sturdivant, not Fine.[12] Such a maneuver also attempts to favor Fine's "primary," argument -- Fine inaccurately argues the absence of clearly established law by complaining of the absence of a factually identical fact scenario matching her skewed version of the summary judgment facts contravening

---

[12] Fine insists upon a successful scavenger hunt for a case that would inform her after the May 2, 2018 meeting, that she could not go to the "private home" or attend "a private dinner in a public restaurant" or send her younger sister a text message using the word, "boycott" or "otherwise exercise her own First Amendment rights without violating Plaintiff's right to Equal Protection based on Plaintiff's race." App. Brief, p. 22. Such arguments merely continue Fine's failure to come to grips with Sturdivant's equal protection theory applying the proper standard of review.

the appropriate standard of review. Such a maneuver improperly conflates the two separate prongs of the analysis, hoping the court will view the context of the case in a manner that imports genuinely disputed fact propositions relevant to the first prong into the second prong of the analysis. *A.M. v. Holmes,* 830 F.3d 1123, 1135 (10th Cir. 2016). The fact that the defendant disputes the plaintiff's version of the facts is a separate issue from whether the violation is clearly established under the plaintiff's version of the facts supported by record evidence viewed in their proper light on summary judgment. *See Mimics, Inc. v. Village of Angel Fire,* 394 F.3d 836, 842 (10th Cir. 2005); *Doe v. Hutchinson, supra.* Courts have found clearly established law of a Constitutional violation under equal protection even when the facts, as here, are disputed, applying separate analyses of the two prongs. *See, e.g., Brown v. Flowers,* 974 F.3d 1178, 1184 (10th Cir. 2020) (disputed issues surrounding whether sexual intercourse between a pretrial detainee and a jailer was consensual or rape did not prevent the law from being clearly established to satisfy the second prong of qualified immunity).

Fine's other arguments viewing the law as "unclear" or "debatable" also lack merit. Fine argues that the law is rendered "unclear" simply because the district court did not arrive at a final resolution whether the summary judgment evidence should be analyzed under standards developed under Title VI, Title VII or 42 U.S.C. § 1983 for analyzing whether or not evidence of illegal motive existed. Fine ignores

that the Court pointed out the parties had not suggested any such framework and then determined that ***regardless*** of which of the three bases upon which the law was analyzed, the same conclusion would be reached.  App. 310 – Order, p. 22.  As already discussed in Section B, *supra,* Fine's failure to ever suggest a non-discriminatory reason for referring to her student as "fucking black" and instead, supplying only excuses related to alleged privacy rights asserted under false premises, or other *non-sequiturs*, certainly is not equivalent with any legitimate argument that the law is rendered unclear in this regard.

Contrary to Fine's unsupported argument, the equal protection law applicable to Fine under *Ramirez, McLaurin,* Title VI and/or its regulations, was also not rendered unclear based on the specific framework for analyzing evidence as summary judgment as opposed to a motion to dismiss.  The question is whether every reasonable educator would have understood beyond debate the illegality of referring to a student's skin color as "fucking black," treating her differently based on race, calling for a boycott of the black student and depriving her of the same opportunities and enjoyment of her high school dance team as non-black team members.  Such a violation has already been established in *Ramirez* and *McLaurin* and applies with obvious clarity to Fine's conduct, regardless of the procedural posture of the underlying case.  No case has required the state actor to possess the equivalent knowledge of the court or lawyers concerning the legal mechanics of

how an equal protection race discrimination case would be prosecuted or analyzed, and this case should not be the first to do so.

## CONCLUSION

The decision of the district court denying summary judgment to Fine should be affirmed, with the case remanded to the district court.

## ORAL ARGUMENT REQUESTED

The facts presented by the parties in their brief are complex and in conflict in material ways. The burden of proof for addressing the qualified immunity defense falls on Sturdivant. Fine, however, possesses the right to the last briefing. The applicable law as applied to facts to which the parties differ is worthy of careful and discerning review. Sturdivant requests oral argument to assist with input in the Court's consideration of all issues.

Respectfully submitted,

**BRATCHER GOCKEL LAW, L.C.**

By    /s/Marie L. Gockel
       Marie L. Gockel, Ks. Bar No. 12591
       Lynne Jaben Bratcher, Dist. Bar No. 70502
       Erin Vernon, Ks Bar No. 25792
       4014 B South Lynn Ct.
       Independence, MO 64055
       Ph: (816) 221-1614
       lynne@bgklawyers.com
       marie@bgklawyers.com
       erin@bgklawyers.com

**ATTORNEYS FOR PLAINTIFF-APPELLEE**

# CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

   [ X ]  This brief contains 12,623 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

   [   ]  This brief uses a monospaced typeface and contains [state the number of] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   [ X ]  This brief has been prepared in a proportionally spaced typeface using [Microsoft Word 2010] in [14pt Times New Roman]; or

   [   ]  This brief has been prepared in a monospaced typeface using [state name and version of word processing program] with [state number of characters per inch and name of type style].

Dated:  December 15, 2020


/s/Marie L. Gockel
**ATTORNEYS FOR PLAINTIFF-APPELLEE**

## CERTIFICATE OF DIGITAL SUBMISSIONS

I hereby certify that all required privacy redactions have been made, and that with exception of those redactions, every document submitted in Digital Form or scanned PDF format is an exact copy of the written document filed with the Clerk; and the digital submissions have been scanned for viruses with the most recent version of Webroot SecureAnywhere, using the December 15, 2020 definitions, and, according to the program, are free of viruses.

/s/Marie L. Gockel
**ATTORNEYS FOR PLAINTIFF-APPELLEE**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that pursuant to FED.R.APP.P. 25(c)(1), 25(c)(2) and 10TH CIR.R. 25.4 the above and foregoing brief of appellee was served electronically through the Court's ECF system, on this 15th day of December 2020, addressed to:

Gregory P. Goheen
McAnany, Van Cleave & Phillips, P.A.
10 E. Cambridge Circle Drive, Suite 300
Kansas City, Kansas 66103

and pursuant to 10TH CIR.R. 31.5, seven (7) copies of the above and foregoing brief of appellee's will be deposited in the United States mail, first class, postage prepaid, to be received in the clerk's office within five (5) business days following receipt of notice that the electronic filing is compliance and addressed to:

Clerk of Court
United States Court of Appeals Tenth Circuit
Office of the Clerk
Byron White U.S. Courthouse
1823 Stout Street
Denver, Colorado 80257

/s/Marie L. Gockel
**ATTORNEYS FOR PLAINTIFF-APPELLEE**

# ADDENDUM

# TABLE OF CONTENTS

34 C.F.R. § 100.3…………………………………………………………ADD.1-A22

*Doe v. Hutchinson,* 728 Fed. Appx. 829 (10th Cir. 2018)
(unpublished)…………………………………………………………..ADD.23-A27

*Townsend-Johnson v. Cleveland*, 894 Fed.Appx. 833 (10th Cir. 2012)
(unpublished)…………………………………………………………..ADD.28-A31

Notice to Readers

The version of 34 C.F.R. Part 100 found here incorporates the amendments made in the notice of Final Regulations published in the *Federal Register* on November 13, 2000, 65 *Fed. Reg.* 68050, and effective on December 13, 2000. This amended regulation is also available in the current edition of the Code of Federal Regulations at Title 34. If there is a discrepancy between the Code of Federal Regulations and the version of 34 C.F.R. Part 100 in this document, the Code of Federal Regulations prevails. The November 13, 2000 Federal Register notice did not make conforming changes to Appendix B to 34 C.F.R. Part 100. Thus, this document is not included in this version of the regulation.

# TITLE 34—EDUCATION

## SUBTITLE B—REGULATIONS OF THE OFFICES OF THE DEPARTMENT OF EDUCATION

### CHAPTER 1—OFFICE FOR CIVIL RIGHTS, DEPARTMENT OF EDUCATION

## PART 100—NONDISCRIMINATION UNDER PROGRAMS RECEIVING FEDERAL ASSISTANCE THROUGH THE DEPARTMENT OF EDUCATION EFFECTUATION OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964

Sec.
100.1    Purpose.
100.2    Application of this regulation.
100.3    Discrimination prohibited.
100.4    Assurances required.
100.5    Illustrative application.
100.6    Compliance information.
100.7    Conduct of investigations.
100.8    Procedure for effecting compliance.
100.9    Hearings.
100.10   Decisions and notices.
100.11   Judicial review.
100.12   Effect on other regulations; forms and instructions.
100.13   Definitions.

APPENDIX A TO PART 100—FEDERAL FINANCIAL ASSISTANCE TO WHICH THESE REGULATIONS APPLY

APPENDIX B TO PART 100—GUIDELINES FOR ELIMINATING DISCRIMINATION AND DENIAL OF SERVICES ON THE BASIS OF RACE, COLOR, NATIONAL ORIGIN, SEX, AND HANDICAP IN VOCATIONAL EDUCATION PROGRAMS

AUTHORITY: Sec. 602, 78 Stat. 252; 42 U.S.C. 2000d-1, unless otherwise noted.

SOURCE: 45 FR 30918, May 9, 1980, unless otherwise noted.

## § 100.1 Purpose.

The purpose of this part is to effectuate the provisions of title VI of the Civil Rights Act of 1964 (hereafter referred to as the "Act") to the end that no person in the United States shall; on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any program or activity receiving Federal financial assistance from the Department of Education.

(Authority: Sec. 601, Civil Rights Act of 1964; 78 Stat. 252; 42 U.S.C. 2000d)

## § 100.2 Application of this regulation.

This regulation applies to any program to which Federal financial assistance is authorized to be extended to a recipient under a law administered by the Department, including the Federal financial assistance listed in appendix A of this regulation. It applies to money paid, property transferred, or other Federal financial assistance extended after the effective date of the regulation pursuant to an application approved prior to such effective date. This regulation does not apply to (a) any Federal financial assistance by way of insurance or guaranty contracts, (b) money paid, property transferred, or other assistance extended before the effective date of this regulation, (c) the use of any assistance by any individual who is the ultimate beneficiary, or (d) any employment practice, or any employer, employment agency, or labor organization, except to the extent described in § 100.3. The fact that a type of Federal assistance is not listed in appendix A shall not mean, if title VI of the Act is otherwise applicable, that a program is not covered. Federal financial assistance under statutes now in force or hereinafter enacted may be added to this list by notice published in the FEDERAL REGISTER.

(Authority: Secs. 602, 604, Civil Rights Act of 1964; 78 Stat. 252, 253; 42 U.S.C. 2000d-1, 2000d-3)

## § 100.3 Discrimination prohibited.

(a) *General.* No person in the United States shall, on the ground of race, color, or national origin be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any program to which this part applies.

(b) *Specific discriminatory actions prohibited.* (1) A recipient under any program to which this part applies may not, directly or through contractual or other arrangements, on ground of race, color, or national origin:

(i) Deny an individual any service, financial aid, or other benefit provided under the program;

(ii) Provide any service, financial aid, or other benefit to an individual which is different, or is provided in a different manner, from that provided to others under the program;

(iii) Subject an individual to segregation or separate treatment in any matter related to his receipt of any service, financial aid, or other benefit under the program;

(iv) Restrict an individual in any way in the enjoyment of any advantage or privilege enjoyed by others receiving any service, financial aid, or other benefit under the program;

(v) Treat an individual differently from others in determining whether he satisfies any admission, enrollment, quota, eligibility, membership or other requirement or condition which individuals must meet in order to be provided any service, financial aid, or other benefit provided under the program;

(vi) Deny an individual an opportunity to participate in the program through the provision of services or otherwise or afford him an opportunity to do so which is different from that afforded others under the program (including the opportunity to participate in the program as an employee but only to the extent set forth in paragraph (c) of this section).

(vii) Deny a person the opportunity to participate as a member of a planning or advisory body which is an integral part of the program.

(2) A recipient, in determining the types of services, financial aid, or other benefits, or facilities which will be provided under any such program, or the class of individuals to whom, or the situations in which, such services, financial aid, other benefits, or facilities will be provided under any such program, or the class of individuals to be afforded an opportunity to participate in any such program, may not, directly or through contractual or other arrangements, utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respect individuals of a particular race, color, or national origin.

(3) In determining the site or location of a facilities, an applicant or recipient may not make selections with the effect of excluding individuals from, denying them the benefits of, or subjecting them to discrimination under any programs to which this regulation applies, on the ground of race, color, or national origin; or with the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the Act or this regulation.

(4) As used in this section, the services, financial aid, or other benefits provided under a program receiving Federal financial assistance shall be deemed to include any service, financial aid, or other benefits provided in or through a facility provided with the aid of Federal financial assistance.

(5) The enumeration of specific forms of prohibited discrimination in this paragraph and paragraph (c) of this section does not limit the generality of the prohibition in paragraph (a) of this section.

(6) (i) In administering a program regarding which the recipient has previously

discriminated against persons on the ground of race, color, or national origin, the recipient must take affirmative action to overcome the effects of prior discrimination.

(ii) Even in the absence of such prior discrimination, a recipient in administering a program may take affirmative action to overcome the effects of conditions which resulted in limiting participation by persons of a particular race, color, or national origin.

(c) *Employment practices.* (1) Where a primary objective of the Federal financial assistance to a program to which this regulation applies is to provide employment, a recipient may not (directly or through contractual or other arrangements) subject an individual to discrimination on the ground of race, color, or national origin in its employment practices under such program (including recruitment or recruitment advertising, employment, layoff or termination, upgrading, demotion, or transfer, rates of pay or other forms of compensation, and use of facilities), including programs where a primary objective of the Federal financial assistance is (i) to reduce the employment of such individuals or to help them through employment to meet subsistence needs, (ii) to assist such individuals through employment to meet expenses incident to the commencement or continuation of their education or training, (iii) to provide work experience which contributes to the education or training of such individuals, or (iv) to provide remunerative activity to such individuals who because of handicaps cannot be readily absorbed in the competitive labor market. The following, under existing laws, have one of the above objectives as a primary objective:

(A) Projects under the Public Works Acceleration Act, Pub. L. 87-658, 42 U.S.C. 2641-2643.

(B) Work-study under the Vocational Education Act of 1963, as amended, 20 U.S.C. 1371-1374.

(C) Programs assisted under laws listed in appendix A as respects employment opportunities provided thereunder, or in facilities provided thereunder, which are limited, or for which preference is given, to students, fellows, or other persons in training for the same or related employments.

(D) Assistance to rehabilitation facilities under the Vocational Rehabilitation Act, 29 U.S.C. 32-34, 41a and 41b.

(2) The requirements applicable to construction employment under any such program shall be those specified in or pursuant to Part III of Executive Order 11246 or any Executive order which supersedes it.

(3) Where a primary objective of the Federal financial assistance is not to provide employment, but discrimination on the ground of race, color, or national origin in the employment practices of the recipient or other persons subject to the regulation tends, on the ground of race, color, or national origin, to exclude individuals from participation in, to deny them the benefits of, or to subject them to discrimination under any program to which this regulation applies, the foregoing provisions of this paragraph (c) shall apply to the employment

practices of the recipient or other persons subject to the regulation, to the extent necessary to assure equality of opportunity to, and nondiscriminatory treatment of, beneficiaries.

(d) *Indian health and Cuban refugee services.* An individual shall not be deemed subjected to discrimination by reason of his exclusion from benefits limited by Federal law to individuals of a particular race, color, or national origin different from his.

(e) *Medical emergencies.* Notwithstanding the foregoing provisions of this section, a recipient of Federal financial assistance shall not be deemed to have failed to comply with paragraph (a) of this section if immediate provision of a service or other benefit to an individual is necessary to prevent his death or serious impairment of his health, and such service or other benefit cannot be provided except by or through a medical institution which refuses or fails to comply with paragraph (a) of this section.

(Authority: Sec. 601, 602, 604, Civil Rights Act of 1964; 78 Stat. 252, 253, 42 U.S.C. 2000d, 2000d-1, 2000d-3)

## § 100.4 Assurances required.

(a) *General.* (1) Every application for Federal financial assistance to which this part applies, except an application to which paragraph (b) of this section applies, and every application for Federal financial assistance to provide a facility shall, as a condition to its approval and the extension of any Federal financial assistance pursuant to the application, contain or be accompanied by an assurance that the program will be conducted or the facility operated in compliance with all requirements imposed by or pursuant to this part. In the case of an application for Federal financial assistance to provide real property or structures thereon, the assurance shall obligate the recipient, or, in the case of a subsequent transfer, the transferee, for the period during which the real property or structures are used for a purpose for which the Federal financial assistance is extended or for another purpose involving the provision of similar services or benefits. In the case of personal property the assurance shall obligate the recipient for the period during which he retains ownership or possession of the property. In all other cases the assurance shall obligate the recipient for the period during which Federal financial assistance is extended pursuant to the application. The responsible Department official shall specify the form of the foregoing assurances, and the extent to which like assurances will be required of subgrantees, contractors and subcontractors, transferees, successors in interest, and other participants. Any such assurance shall include provisions which give the United States a right to seek its judicial enforcement.

(2) Where Federal financial assistance is provided in the form of a transfer of real property or interest therein from the Federal Government the instrument effecting or recording the transfer shall contain a covenant running with the land to assure nondiscrimination for the period during which the real property is used for a purpose for which the Federal financial assistance is extended or for another purpose involving the provision of similar services or benefits. Where no transfer of property is involved but property is improved with Federal financial assistance, the recipient shall agree to include such a covenant to any subsequent transfer of the property. Where the property is obtained from the Federal Government, such

covenant may also include a condition coupled with a right to be reserved by the Department to revert title to the property in the event of a breach of the covenant where, in the discretion of the responsible Department official, such a condition and right of reverter is appropriate to the statute under which the real property is obtained and to the nature of the grant and the grantee. In the event a transferee of real property proposes to mortgage or otherwise encumber the real property as security for financing construction of new, or improvement of existing, facilities on such property for the purposes for which the property was transferred, the responsible Department official may agree, upon request of the transferee and if necessary to accomplish such financing, and upon such conditions as he deems appropriate, to forbear the exercise of such right to revert title for so long as the lien of such mortgage or other encumbrance remains effective.

(b) *Continuing Federal financial assistance.* Every application by a State or a State agency for continuing Federal financial assistance to which this regulation applies (including the Federal financial assistance listed in part 2 of appendix A) shall as a condition to its approval and the extension of any Federal financial assistance pursuant to the application (1) contain or be accompanied by a statement that the program is (or, in the case of a new program, will be) conducted in compliance with all requirements imposed by or pursuant to this regulation, and (2) provide or be accompanied by provision for such methods of administration for the program as are found by the responsible Department official to give reasonable assurance that the applicant and all recipients of Federal financial assistance under such program will comply with all requirements imposed by or pursuant to this regulation.

(c) *Elementary and secondary schools.* The requirements of paragraph (a) or (b) of this section with respect to any elementary or secondary school or school system shall be deemed to be satisfied if such school or school system (1) is subject to a final order of a court of the United States for the desegregation of such school or school system, and provides an assurance that it will comply with such order, including any future modification of such order, or (2) submits a plan for the desegregation of such school or school system which the responsible Department official determines is adequate to accomplish the purposes of the Act and this part, at the earliest practicable time, and provides reasonable assurance that it will carry out such plan; in any case of continuing Federal financial assistance the responsible Department official may reserve the right to redetermine, after such period as may be specified by him, the adequacy of the plan to accomplish the purposes of the Act and the regulations in this part. In any case in which a final order of a court of the United States for the desegregation of such school or school system is entered after submission of such a plan, such plan shall be revised to conform to such final order, including any future modification of such order.

(d) *Assurance from institutions.* (1) In the case of any application for Federal financial assistance to an institution of higher education (including assistance for construction, for research, for special training project, for student loans or for any other purpose), the assurance required by this section shall extend to admission practices and to all other practices relating to the treatment of students.

(2) The assurance required with respect to an institution of higher education, hospital, or any other institution, insofar as the assurance relates to the institution's practices with respect to

admission or other treatment of individuals as students, patients, or clients of the institution or to the opportunity to participate in the provision of services or other benefits to such individuals, shall be applicable to the entire institution.

(Authority: Sec. 601, 602, Civil Rights Act of 1964; 78 Stat. 252; 42 U.S.C. 2000d, 2000d-1. Sec. 182; 80 Stat. 1209; 42 U.S.C. 2000d-5)

## § 100.5 Illustrative application.

The following examples will illustrate the programs aided by Federal financial assistance of the Department. (In all cases the discrimination prohibited is discrimination on the ground of race, color, or national origin prohibited by title VI of the Act and this regulation, as a condition of the receipt of Federal financial assistance).

(a) In federally-affected area assistance (Pub. L. 815 and Pub. L. 874) for construction aid and for general support of the operation of elementary or secondary schools, or in more limited support to such schools such as for the acquisition of equipment, the provision of vocational education, or the provision of guidance and counseling services, discrimination by the recipient school district in any of its elementary or secondary schools in the admission of students, or in the treatment of its students in any aspect of the educational process, is prohibited. In this and the following illustrations the prohibition of discrimination in the treatment of students or other trainees includes the prohibition of discrimination among the students or trainees in the availability or use of any academic, dormitory, eating, recreational, or other facilities of the grantee or other recipient.

(b) In a research, training, demonstration, or other grant to a university for activities to be conducted in a graduate school, discrimination in the admission and treatment of students in the graduate school is prohibited, and the prohibition extends to the entire university.

(c) In a training grant to a hospital or other nonacademic institution, discrimination is prohibited in the selection of individuals to be trained and in their treatment by the grantee during their training. In a research or demonstration grant to such an institution discrimination is prohibited with respect to any educational activity and any provision of medical or other services and any financial aid to individuals incident to the program.

(d) In grants to assist in the construction of facilities for the provision of health, educational or welfare services, assurances will be required that services will be provided without discrimination, to the same extent that discrimination would be prohibited as a condition of Federal operating grants for the support of such services. Thus, as a condition of grants for the construction of academic, research, or other facilities at institutions of higher education, assurances will be required that there will be no discrimination in the admission or treatment of students.

(e) Upon transfers of real or personal surplus property for educational uses, discrimination is prohibited to the same extent as in the case of grants for the construction of facilities or the provision of equipment for like purposes.

(f) Each applicant for a grant for the construction of educational television facilities is required to provide an assurance that it will, in its broadcast services, give due consideration to the interests of all significant racial or ethnic groups within the population to be served by the applicant.

(g) A recipient may not take action that is calculated to bring about indirectly what this regulation forbids it to accomplish directly. Thus, a State, in selecting or approving projects or sites for the construction of public libraries which will receive Federal financial assistance, may not base its selections or approvals on criteria which have the effect of defeating or of substantially impairing accomplishments of the objectives of the Federal assistance as respects individuals of a particular race, color or national origin.

(h) In some situations, even though past discriminatory practices attributable to a recipient or applicant have been abandoned, the consequences of such practices continue to impede the full availability of a benefit. If the efforts required of the applicant or recipient under § 100.6(d), to provide information as to the availability of the program or activity and the rights of beneficiaries under this regulation, have failed to overcome these consequences, it will become necessary under the requirement stated in paragraph (i) of § 100.3(b)(6) for such applicant or recipient to take additional steps to make the benefits fully available to racial and nationality groups previously subject to discrimination. This action might take the form, for example, of special arrangements for obtaining referrals or making selections which will insure that groups previously subjected to discrimination are adequately served.

(i) Even though an applicant or recipient has never used discriminatory policies, the services and benefits of the program or activity it administers may not in fact be equally available to some racial or nationality groups. In such circumstances, an applicant or recipient may properly give special consideration to race, color, or national origin to make the benefits of its program more widely available to such groups, not then being adequately served. For example, where a university is not adequately serving members of a particular racial or nationality group, it may establish special recruitment policies to make its program better known and more readily available to such group, and take other steps to provide that group with more adequate service.

(Authority: Sec. 601, 602, Civil Rights Act of 1964; 78 Stat. 252; 42 U.S.C. 2000d, 2000d-1)

## § 100.6 Compliance information.

(a) *Cooperation and assistance.* The responsible Department official shall to the fullest extent practicable seek the cooperation of recipients in obtaining compliance with this part and shall provide assistance and guidance to recipients to help them comply voluntarily with this part.

(b) *Compliance reports.* Each recipient shall keep such records and submit to the responsible Department official or his designee timely, complete and accurate compliance reports at such times, and in such form and containing such information, as the responsible

Department official or his designee may determine to be necessary to enable him to ascertain whether the recipient has complied or is complying with this part. For example, recipients should have available for the Department racial and ethnic data showing the extent to which members of minority groups are beneficiaries of and participants in federally-assisted programs. In the case in which a primary recipient extends Federal financial assistance to any other recipient, such other recipient shall also submit such compliance reports to the primary recipient as may be necessary to enable the primary recipient to carry out its obligations under this part.

(c) *Access to sources of information.* Each recipient shall permit access by the responsible Department official or his designee during normal business hours to such of its books, records, accounts, and other sources of information, and its facilities as may be pertinent to ascertain compliance with this part. Where any information required of a recipient is in the exclusive possession of any other agency, institution or person and this agency, institution or person shall fail or refuse to furnish this information the recipient shall so certify in its report and shall set forth what efforts it has made to obtain the information. Asserted considerations of privacy or confidentiality may not operate to bar the Department from evaluating or seeking to enforce compliance with this part. Information of a confidential nature obtained in connection with compliance evaluation or enforcement shall not be disclosed except where necessary in formal enforcement proceedings or where otherwise required by law.

(d) *Information to beneficiaries and participants.* Each recipient shall make available to participants, beneficiaries, and other interested persons such information regarding the provisions of this regulation and its applicability to the program for which the recipient receives Federal financial assistance, and make such information available to them in such manner, as the responsible Department official finds necessary to apprise such persons of the protections against discrimination assured them by the Act and this regulation.

(Approved by the Office of Management and Budget under control number 1870-0500)

(Authority: Sec. 601, 602, Civil Rights Act of 1964; 78 Stat. 252; 42 U.S.C. 2000d, 2000d-1)

[45 FR 30918, May 9, 1980, as amended at 53 FR 49143, Dec. 6, 1988]

## § 100.7 Conduct of investigations.

(a) *Periodic compliance reviews.* The responsible Department official or his designee shall from time to time review the practices of recipients to determine whether they are complying with this part.

(b) *Complaints.* Any person who believes himself or any specific class of individuals to be subjected to discrimination prohibited by this part may by himself or by a representative file with the responsible Department official or his designee a written complaint. A complaint must be filed not later than 180 days from the date of the alleged discrimination, unless the time for filing is extended by the responsible Department official or his designee.

(c) *Investigations.* The responsible Department official or his designee will make a

prompt investigation whenever a compliance review, report, complaint, or any other information indicates a possible failure to comply with this part. The investigation should include, where appropriate, a review of the pertinent practices and policies of the recipient, the circumstances under which the possible noncompliance with this part occurred, and other factors relevant to a determination as to whether the recipient has failed to comply with this part.

(d) *Resolution of matters.* (1) If an investigation pursuant to paragraph (c) of this section indicates a failure to comply with this part, the responsible Department official or his designee will so inform the recipient and the matter will be resolved by informal means whenever possible. If it has been determined that the matter cannot be resolved by informal means, action will be taken as provided for in § 100.8.

(2) If an investigation does not warrant action pursuant to paragraph (1) of this paragraph (d) the responsible Department official or his designee will so inform the recipient and the complainant, if any, in writing.

(e) *Intimidatory or retaliatory acts prohibited.* No recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by section 601 of the Act or this part, or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this part. The identity of complainants shall be kept confidential except to the extent necessary to carry out the purposes of this part, including the conduct of any investigation, hearing, or judicial proceeding arising thereunder.

(Authority: Sec. 601, 602, Civil Rights Act of 1964; 78 Stat. 252; 42 U.S.C. 2000d, 2000d-1)

## § 100.8 Procedure for effecting compliance.

(a) *General.* If there appears to be a failure or threatened failure to comply with this regulation, and if the noncompliance or threatened noncompliance cannot be corrected by informal means, compliance with this part may be effected by the suspension or termination of or refusal to grant or to continue Federal financial assistance or by any other means authorized by law. Such other means may include, but are not limited to, (1) a reference to the Department of Justice with a recommendation that appropriate proceedings be brought to enforce any rights of the United States under any law of the United States (including other titles of the Act), or any assurance or other contractual undertaking, and (2) any applicable proceeding under State or local law.

(b) *Noncompliance with § 100.4.* If an applicant fails or refuses to furnish an assurance required under § 100.4 or otherwise fails or refuses to comply with a requirement imposed by or pursuant to that section Federal financial assistance may be refused in accordance with the procedures of paragraph (c) of this section. The Department shall not be required to provide assistance in such a case during the pendency of the administrative proceedings under such paragraph except that the Department shall continue assistance during the pendency of such proceedings where such assistance is due and payable pursuant to an application therefor approved prior to the effective date of this part.

(c) *Termination of or refusal to grant or to continue Federal financial assistance.* No order suspending, terminating or refusing to grant or continue Federal financial assistance shall become effective until (1) the responsible Department official has advised the applicant or recipient of his failure to comply and has determined that compliance cannot be secured by voluntary means, (2) there has been an express finding on the record, after opportunity for hearing, of a failure by the applicant or recipient to comply with a requirement imposed by or pursuant to this part, (3) the expiration of 30 days after the Secretary has filed with the committee of the House and the committee of the Senate having legislative jurisdiction over the program involved, a full written report of the circumstances and the grounds for such action. Any action to suspend or terminate or to refuse to grant or to continue Federal financial assistance shall be limited to the particular political entity, or part thereof, or other applicant or recipient as to whom such a finding has been made and shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found.

(d) *Other means authorized by law.* No action to effect compliance by any other means authorized by law shall be taken until (1) the responsible Department official has determined that compliance cannot be secured by voluntary means, (2) the recipient or other person has been notified of its failure to comply and of the action to be taken to effect compliance, and (3) the expiration of at least 10 days from the mailing of such notice to the recipient or other person. During this period of at least 10 days additional efforts shall be made to persuade the recipient or other person to comply with the regulation and to take such corrective action as may be appropriate.

(Authority: Sec. 601, 602, Civil Rights Act of 1964; 78 Stat. 252; 42 U.S.C. 2000d, 2000d-1. Sec. 182, 80 Stat. 1209; 42 U.S.C. 2000d-5)

## § 100.9 Hearings.

(a) *Opportunity for hearing.* Whenever an opportunity for a hearing is required by § 100.8(c), reasonable notice shall be given by registered or certified mail, return receipt requested, to the affected applicant or recipient. This notice shall advise the applicant or recipient of the action proposed to be taken, the specific provision under which the proposed action against it is to be taken, and the matters of fact or law asserted as the basis for this action, and either (1) fix a date not less than 20 days after the date of such notice within which the applicant or recipient may request of the responsible Department official that the matter be scheduled for hearing or (2) advise the applicant or recipient that the matter in question has been set down for hearing at a stated place and time. The time and place so fixed shall be reasonable and shall be subject to change for cause. The complainant, if any, shall be advised of the time and place of the hearing. An applicant or recipient may waive a hearing and submit written information and argument for the record. The failure of an applicant or recipient to request a hearing for which a date has been set shall be deemed to be a waiver of the right to a hearing under section 602 of the Act and § 100.8(c) of this regulation and consent to the making of a decision on the basis of such information as may be filed as the record.

(b) *Time and place of hearing.* Hearings shall be held at the offices of the Department in

Washington, DC, at a time fixed by the responsible Department official unless he determines that the convenience of the applicant or recipient or of the Department requires that another place be selected. Hearings shall be held before a hearing examiner designated in accordance with 5 U.S.C. 3105 and 3344 (section 11 of the Administrative Procedure Act).

(c) *Right to counsel.* In all proceedings under this section, the applicant or recipient and the Department shall have the right to be represented by counsel.

(d) *Procedures, evidence, and record.* (1) The hearing, decision, and any administrative review thereof shall be conducted in conformity with sections 5-8 of the Administrative Procedure Act, and in accordance with such rules of procedure as are proper (and not inconsistent with this section) relating to the conduct of the hearing, giving of notices subsequent to those provided for in paragraph (a) of this section, taking of testimony, exhibits, arguments and briefs, requests for findings, and other related matters. Both the Department and the applicant or recipient shall be entitled to introduce all relevant evidence on the issues as stated in the notice for hearing or as determined by the officer conducting the hearing at the outset of or during the hearing. Any person (other than a Government employee considered to be on official business) who, having been invited or requested to appear and testify as a witness on the Government's behalf, attends at a time and place scheduled for a hearing provided for by this part, may be reimbursed for his travel and actual expenses of attendance in an amount not to exceed the amount payable under the standardized travel regulations to a Government employee traveling on official business.

(2) Technical rules of evidence shall not apply to hearings conducted pursuant to this part, but rules or principles designed to assure production of the most credible evidence available and to subject testimony to test by cross-examination shall be applied where reasonably necessary by the officer conducting the hearing. The hearing officer may exclude irrelevant, immaterial, or unduly repetitious evidence. All documents and other evidence offered or taken for the record shall be open to examination by the parties and opportunity shall be given to refute facts and arguments advanced on either side of the issues. A transcript shall be made of the oral evidence except to the extent the substance thereof is stipulated for the record. All decisions shall be based upon the hearing record and written findings shall be made.

(e) *Consolidated or joint hearings.* In cases in which the same or related facts are asserted to constitute noncompliance with this regulation with respect to two or more Federal assistance statutes to which this part applies, or noncompliance with this part and the regulations of one or more other Federal departments or agencies issued under title VI of the Act, the responsible Department official may, by agreement with such other departments or agencies where applicable, provide for the conduct of consolidated or joint hearings, and for the application to such hearings of rules of procedures not inconsistent with this part. Final decisions in such cases, insofar as this regulation is concerned, shall be made in accordance with § 100.10.

(Authority: Sec. 602, Civil Rights Act of 1964; 78 Stat. 252; 42 U.S.C. 2000d-1)

## § 100.10 Decisions and notices.

(a) *Decisions by hearing examiners.* After a hearing is held by a hearing examiner such hearing examiner shall either make an initial decision, if so authorized, or certify the entire record including his recommended findings and proposed decision to the reviewing authority for a final decision, and a copy of such initial decision or certification shall be mailed to the applicant or recipient and to the complainant, if any. Where the initial decision referred to in this paragraph or in paragraph (c) of this section is made by the hearing examiner, the applicant or recipient or the counsel for the Department may, within the period provided for in the rules of procedure issued by the responsible Department official, file with the reviewing authority exceptions to the initial decision, with his reasons therefor. Upon the filing of such exceptions the reviewing authority shall review the initial decision and issue its own decision thereof including the reasons therefor. In the absence of exceptions the initial decision shall constitute the final decision, subject to the provisions of paragraph (e) of this section.

(b) *Decisions on record or review by the reviewing authority.* Whenever a record is certified to the reviewing authority for decision or it reviews the decision of a hearing examiner pursuant to paragraph (a) or (c) of this section, the applicant or recipient shall be given reasonable opportunity to file with it briefs or other written statements of its contentions, and a copy of the final decision of the reviewing authority shall be given in writing to the applicant or recipient and to the complainant, if any.

(c) *Decisions on record where a hearing is waived.* Whenever a hearing is waived pursuant to § 100.9(a) the reviewing authority shall make its final decision on the record or refer the matter to a hearing examiner for an initial decision to be made on the record. A copy of such decision shall be given in writing to the applicant or recipient, and to the complainant, if any.

(d) *Rulings required.* Each decision of a hearing examiner or reviewing authority shall set forth a ruling on each finding, conclusion, or exception presented, and shall identify the requirement or requirements imposed by or pursuant to this part with which it is found that the applicant or recipient has failed to comply.

(e) *Review in certain cases by the Secretary.* If the Secretary has not personally made the final decision referred to in paragraphs (a), (b), or (c) of this section, a recipient or applicant or the counsel for the Department may request the Secretary to review a decision of the Reviewing Authority in accordance with rules of procedure issued by the responsible Department official. Such review is not a matter of right and shall be granted only where the Secretary determines there are special and important reasons therefor. The Secretary may grant or deny such request, in whole or in part. He may also review such a decision upon his own motion in accordance with rules of procedure issued by the responsible Department official. In the absence of a review under this paragraph, a final decision referred to in paragraphs (a), (b), (c) of this section shall become the final decision of the Department when the Secretary transmits it as such to Congressional committees with the report required under section 602 of the Act. Failure of an applicant or recipient to file an exception with the Reviewing Authority or to request review under this paragraph shall not be deemed a failure to exhaust administrative remedies for the purpose of obtaining judicial review.

(f) *Content of orders.* The final decision may provide for suspension or termination of, or

refusal to grant or continue Federal financial assistance, in whole or in part, to which this regulation applies, and may contain such terms, conditions, and other provisions as are consistent with and will effectuate the purposes of the Act and this regulation, including provisions designed to assure that no Federal financial assistance to which this regulation applies will thereafter be extended under such law or laws to the applicant or recipient determined by such decision to be in default in its performance of an assurance given by it pursuant to this regulation, or to have otherwise failed to comply with this regulation unless and until it corrects its noncompliance and satisfies the responsible Department official that it will fully comply with this regulation.

(g) *Post-termination proceedings.* (1) An applicant or recipient adversely affected by an order issued under paragraph (f) of this section shall be restored to full eligibility to receive Federal financial assistance if it satisfies the terms and conditions of that order for such eligibility or if it brings itself into compliance with this part and provides reasonable assurance that it will fully comply with this part. An elementary or secondary school or school system which is unable to file an assurance of compliance with § 100.3 shall be restored to full eligibility to receive Federal financial assistance, if it files a court order or a plan for desegregation which meets the requirements of § 100.4(c), and provides reasonable assurance that it will comply with the court order or plan.

(2) Any applicant or recipient adversely affected by an order entered pursuant to paragraph (f) of this section may at any time request the responsible Department official to restore fully its eligibility to receive Federal financial assistance. Any such request shall be supported by information showing that the applicant or recipient has met the requirements of paragraph (g)(1) of this section. If the responsible Department official determines that those requirements have been satisfied, he shall restore such eligibility.

(3) If the responsible Department official denies any such request, the applicant or recipient may submit a request for a hearing in writing, specifying why it believes such official to have been in error. It shall thereupon be given an expeditious hearing, with a decision on the record, in accordance with rules of procedure issued by the responsible Department official. The applicant or recipient will be restored to such eligibility if it proves at such hearing that it satisfied the requirements of paragraph (g)(1) of this section. While proceedings under this paragraph are pending, the sanctions imposed by the order issued under paragraph (f) of this section shall remain in effect.

(Authority: Sec. 602, Civil Rights Act of 1964; 78 Stat. 252; 42 U.S.C. 2000d-1)

## § 100.11 Judicial review.

Action taken pursuant to section 602 of the Act is subject to judicial review as provided in section 603 of the Act.

(Authority: Sec. 603, 78 Stat. 253; 42 U.S.C. 2000d-2)

## § 100.12 Effect on other regulations; forms and instructions.

(a) *Effect on other regulations.* All regulations, orders, or like directions heretofore issued by any officer of the Department which impose requirements designed to prohibit any discrimination against individuals on the ground of race, color, or national origin under any program to which this regulation applies, and which authorize the suspension or termination of or refusal to grant or to continue Federal financial assistance to any applicant for or recipient of assistance for failure to comply with such requirements, are hereby superseded to the extent that such discrimination is prohibited by this regulation, except that nothing in this regulation shall be deemed to relieve any person of any obligation assumed or imposed under any such superseded regulation, order, instruction, or like direction prior to the effective date of this regulation. Nothing in this regulation, however, shall be deemed to supersede any of the following (including future amendments thereof):

(1) Executive Order 11063 and regulations issued thereunder, or any other regulations or instructions, insofar as such Order, regulations, or instructions prohibit discrimination on the ground of race, color, or national origin in any program or situation to which this regulation is inapplicable, or prohibit discrimination on any other ground; or

(2) Requirements for Emergency School Assistance as published in 35 FR 13442 and codified as 34 CFR, part 280.

(b) *Forms and instructions.* The responsible Department official shall issue and promptly make available to interested persons forms and detailed instructions and procedures for effectuating this part.

(c) *Supervision and coordination.* The responsible Department official may from time to time assign to officials of the Department, or to officials of other departments or agencies of the Government with the consent of such departments or agencies, responsibilities in connection with the effectuation of the purposes of title VI of the Act and this regulation (other than responsibility for review as provided in § 100.10(e)), including the achievements of effective coordination and maximum uniformity within the Department and within the Executive Branch of the Government in the application of title VI and this regulation to similar programs and in similar situations. Any action taken, determination made, or requirement imposed by an official of another Department or Agency acting pursuant to an assignment of responsibility under this section shall have the same effect as though such action had been taken by the responsible official of this Department.

(Authority: Sec. 602, Civil Rights Act of 1964; 78 Stat. 252; 42 U.S.C. 2000d-1)

## § 100.13 Definitions.

As used in this part:

(a) The term *Department* means the Department of Education.

ADD.000015

(b) The term *Secretary* means the Secretary of Education.

(c) The term *responsible Department official* means the Secretary or, to the extent of any delegation by the Secretary of authority to act in his stead under any one or more provisions of this part, any person or persons to whom the Secretary has heretofore delegated, or to whom the Secretary may hereafter delegate such authority.

(d) The term *reviewing authority* means the Secretary, or any person or persons (including a board or other body specially created for that purpose and also including the responsible Department official) acting pursuant to authority delegated by the Secretary to carry out responsibilities under § 100.10(a)-(d).

(e) The term *United States* means the States of the United States, the District of Columbia, Puerto Rico, the Virgin Islands, American Samoa, Guam, Wake Island, the Canal Zone, and the territories and possessions of the United States, and the term "State" means any one of the foregoing.

(f) The term *Federal financial assistance* includes (1) grants and loans of Federal funds, (2) the grant or donation of Federal property and interests in property, (3) the detail of Federal personnel, (4) the sale and lease of, and the permission to use (on other than a casual or transient basis), Federal property or any interest in such property without consideration or at a nominal consideration, or at a consideration which is reduced for the purpose of assisting the recipient, or in recognition of the public interest to be served by such sale or lease to the recipient, and (5) any Federal agreement, arrangement, or other contract which has as one of its purposes the provision of assistance.

(g) The term *program or activity* and the term *program* mean all of the operations of—

(1)(i) A department, agency, special purpose district, or other instrumentality of a State or of a local government; or

(ii) The entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government;

(2)(i) A college, university, or other postsecondary institution, or a public system of higher education; or

(ii) A local educational agency (as defined in 20 U.S.C. 8801), system of vocational education, or other school system;

(3)(i) An entire corporation, partnership, or other private organization, or an entire sole proprietorship—

(A) If assistance is extended to such corporation, partnership, private organization, or sole proprietorship as a whole; or

(B) Which is principally engaged in the business of providing education, health care, housing, social services, or parks and recreation; or

(ii) The entire plant or other comparable, geographically separate facility to which Federal financial assistance is extended, in the case of any other corporation, partnership, private organization, or sole proprietorship; or

(4) Any other entity that is established by two or more of the entities described in paragraph (g)(1), (2), or (3) of this section; any part of which is extended Federal financial assistance.

(Authority: 42 U.S.C. 2000d—4)

(h) The term *facility* includes all or any portion of structures, equipment, or other real or personal property or interests therein, and the provision of facilities includes the construction, expansion, renovation, remodeling, alteration or acquisition of facilities.

(i) The term *recipient* means any State, political subdivision of any State, or instrumentality of any State or political subdivision, any public or private agency, institution, or organization, or other entity, or any individual, in any State, to whom Federal financial assistance is extended, directly or through another recipient, including any successor, assign, or transferee thereof, but such term does not include any ultimate beneficiary.

(j) The term *primary recipient* means any recipient which is authorized or required to extend Federal financial assistance to another recipient.

(k) The term *applicant* means one who submits an application, request, or plan required to be approved by a Department official, or by a primary recipient, as a condition to eligibility for Federal financial assistance, and the term *application* means such an application, request, or plan.

(Authority: Sec. 602, Civil Rights Act of 1964; 78 Stat. 252; 42 U.S.C. 2000d-1)

## APPENDIX A TO PART 100 -- FEDERAL FINANCIAL ASSISTANCE TO WHICH THESE REGULATIONS APPLY

*Part 1 –Assistance Other Than Continuing Assistance to States*

1. Loans for acquisition of equipment for academic subjects, and for minor remodeling (20 U.S.C. 445).

2. Construction of facilities for institutions of higher education (20 U.S.C. 701-758).

3. School Construction in federally-affected and in major disaster areas (20 U.S.C. 631-647).

4. Construction of educational broadcast facilities (47 U.S.C. 390-399).

5. Loan service of captioned films and educational media; research on, and production and distribution of, educational media for the handicapped, and training of persons in the use of such media for the handicapped (20 U.S.C. 1452).

6. Demonstration residential vocational education schools (20 U.S.C. 1321).

7. Research and related activities in education of handicapped children (20 U.S.C. 1441).

8. Educational research, dissemination and demonstration projects; research training; and construction under the Cooperation Research Act (20 U.S.C. 331-332(b)).

9. Research in teaching modern foreign languages (20 U.S.C. 512).

10. Training projects for manpower development and training (42 U.S.C. 2601, 2602, 2610a-2610c).

11. Research and training projects in Vocational Education (20 U.S.C. 1281(a), 1282-1284).

12. Allowances to institutions training NDEA graduate fellows (20 U.S.C. 461-465).

13. Grants for training in librarianship (20 U.S.C. 1031-1033).

14. Grants for training personnel for the education of handicapped children (20 U.S.C. 1431).

15. Allowances for institutions training teachers and related educational personnel in elementary and secondary education, or post-secondary vocational education (20 U.S.C. 1111-1118).

16. Recruitment, enrollment, training and assignment of Teacher Corps personnel (20 U.S.C. 1101-1107a).

17. Operation and maintenance of schools in Federally-affected and in major disaster areas (20 U.S.C. 236-241; 241-1; 242-244).

18. Grants or contracts for the operation of training institutes for elementary or secondary school personnel to deal with special educational problems occasioned by desegregation (42 U.S.C. 2000c-3).

19. Grants for in-service training of teachers and other schools personnel and employment of specialists in desegregation problems (42 U.S.C. 2000c-4).

20. Higher education students loan program (Title II, National Defense Education Act, 20 U.S.C. 421-429).

ADD.000018

21. Educational Opportunity grants and assistance for State and private programs of low-interest insured loans and State loans to students in institutions of higher education (Title IV, Higher Education Act of 1965, 20 U.S.C. 1061-1087).

22. Grants and contracts for the conduct of Talent Search, Upward Bound, and Special Services Programs (20 U.S.C. 1068).

23. Land-grant college aid (7 U.S.C. 301-308; 321-326; 328-331).

24. Language and area centers (Title VI, National Defense Education Act, 20 U.S.C. 511).

25. American Printing House for the Blind (20 U.S.C. 101-105).

26. Future Farmers of America (36 U.S.C. 271-391) and similar programs.

27. Science clubs (Pub. L. 85-875, 20 U.S.C. 2, note).

28. Howard University (20 U.S.C. 121-129).

29. Gallaudet College (31 D.C. Code, Chapter 10).

30. Establishment and operation of a model secondary school for the deaf by Gallaudet College (31 D.C. Code 1051-1053; 80 Stat. 1027-1028).

31. Faculty development programs, workshops and institutes (20 U.S.C. 1131-1132).

32. National Technical Institute for the Deaf (20 U.S.C. 681-685).

33. Institutes and other programs for training educational personnel (parts D, E, and F, Title V, Higher Education Act of 1965) (20 U.S.C. 1119-1119c-4).

34. Grants and contracts for research and demonstration projects in librarianship (20 U.S.C. 1034).

35. Acquisition of college library resources (20 U.S.C. 1021-1028).

36. Grants for strengthening developing institutions of higher education (20 U.S.C. 1051-1054); National Fellowships for teaching at developing institutions (20 U.S.C. 1055), and grants to retired professors to teach at developing institutions (20 U.S.C. 1056).

37. College Work-Study Program (42 U.S.C. 2751-2757).

38. Financial assistance for acquisition of higher education equipment, and minor remodeling (20 U.S.C. 1121-1129).

39. Grants for special experimental demonstration projects and teacher training in adult

education (20 U.S.C. 1208).

40. Grant programs for advanced and undergraduate international studies (20 U.S.C. 1171-1176; 22 U.S.C. 2452(b)).

41. Experimental projects for developing State leadership or establishment of special services (20 U.S.C. 865).

42. Grants to and arrangements with State educational and other agencies to meet special educational needs of migratory children of migratory agricultural workers (20 U.S.C. 241e(c)).

43. Grants by the Secretary to local educational agencies for supplementary educational centers and services; guidance, counseling, and testing (20 U.S.C. 841-844; 844b).

44. Resource centers for improvement of education of handicapped children (20 U.S.C. 1421) and centers and services for deaf-blind children (20 U.S.C. 1422).

45. Recruitment of personnel and dissemination of information on education of handicapped (20 U.S.C. 1433).

46. Grants for research and demonstrations relating to physical education or recreation for handicapped children (20 U.S.C. 1442) and training of physical educators and recreation personnel (20 U.S.C. 1434).

47. Dropout prevention projects (20 U.S.C. 887).

48. Bilingual education programs (20 U.S.C. 880b-880b-6).

49. Grants to agencies and organizations for Cuban refugees (22 U.S.C. 2601(b)(4)).

50. Grants and contracts for special programs for children with specific learning disabilities including research and related activities, training and operating model centers (20 U.S.C. 1461).

51. Curriculum development in vocational and technical education (20 U.S.C. 1391).

52. Establishment, including construction, and operation of a National Center on Educational Media and Materials for the Handicapped (20 U.S.C. 1453).

53. Grants and contracts for the development and operation of experimental preschool and early education programs for handicapped (20 U.S.C. 1423).

54. Grants to public or private non-profit agencies to carry on the Follow Through Program in kindergarten and elementary schools (42 U.S.C. 2809 (a)(2)).

55. Grants for programs of cooperative education and grants and contracts for training and research in cooperative education (20 U.S.C. 1087a-1087c).

56. Grants and contracts to encourage the sharing of college facilities and resources (network for knowledge) (20 U.S.C. 1133- 1133b).

57. Grants, contracts, and fellowships to improve programs preparing persons for public service and to attract students to public service (20 U.S.C. 1134-1134b).

58. Grants for the improvement of graduate programs (20 U.S.C. 1135-1135c).

59. Contracts for expanding and improving law school clinical experience programs (20 U.S.C. 1136-1136b).

60. Exemplary programs and projects in vocational education (20 U.S.C. 1301-1305).

61. Grants to reduce borrowing cost for construction of residential schools and dormitories (20 U.S.C. 1323).

62. Surplus real and related personal property disposal for educational purposes (40 U.S.C. 484(k)).

*Part 2 – Continuing Assistance to States*

1. Grants to States for public library service and construction, interlibrary cooperation and specialized State library services for certain State institutions and the physically handicapped (20 U.S.C. 351-355).

2. Grants to States for strengthening instruction in academic subjects (20 U.S.C. 441-444).

3. Grants to States for vocational education (20 U.S.C. 1241-1264).

4. Arrangements with State education agencies for training under the Manpower Development and Training Act (42 U.S.C. 2601-2602, 2610a).

5. Grants to States to assist in the elementary and secondary education of children of low-income families (20 U.S.C. 241a-242m).

6. Grants to States to provide for school library resources, textbooks and other instructional materials for pupils and teachers in elementary and secondary schools (20 U.S.C. 821-827).

7. Grants to States to strengthen State departments of education (20 U.S.C. 861-870).

8. Grants to States for community service programs (20 U.S.C. 1001-1011).

9. Grants to States for adult basic education and related research, teacher training and special projects (20 U.S.C. 1201-1211).

ADD.000021

10. Grants to States educational agencies for supplementary educational centers and services, and guidance, counseling and testing (20 U.S.C. 841-847).

11. Grants to States for research and training in vocational education (20 U.S.C. 1281(b)).

12. Grants to States for exemplary programs and projects in vocational education (20 U.S.C. 1301-1305).

13. Grants to States for residential vocational education schools (20 U.S.C. 1321).

14. Grants to States for consumer and homemaking education (20 U.S.C. 1341).

15. Grants to States for cooperative vocational educational program (20 U.S.C. 1351-1355).

16. Grants to States for vocational work-study programs (20 U.S.C. 1371-1374).

17. Grants to States to attract and qualify teachers to meet critical teaching shortages (20 U.S.C. 1108-1110c).

18. Grants to States for education of handicapped children (20 U.S.C. 1411-1414).

19. Grants for administration of State plans and for comprehensive planning to determine construction needs of institutions of higher education (20 U.S.C. 715(b)).

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by Roe v. Wilson, D.D.C., February 4, 2019

728 Fed.Appx. 829

This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial
decisions issued on or after Jan. 1, 2007.
See also U.S.Ct. of App. 10th Cir. Rule 32.1.
United States Court of Appeals, Tenth Circuit.

Jane DOE, minor; Angela
Harrison, Jane Doe's mother, as
next friend, Plaintiffs-Appellees,

v.

Brock HUTCHINSON,
Defendant-Appellant,

and

USD 237, The Smith Center
School District, Defendant.

No. 17-3070
|
Filed March 30, 2018

**Synopsis**

**Background:** Student, a minor, and her mother, as next
friend brought § 1983 action against teacher and school
district, alleging, inter alia, violations of student's Fourteenth
Amendment equal protection right to be free from sexual
harassment in an educational setting and her Fourth and
Fourteenth Amendment right to privacy in personal sexual
matters. The United States District Court for the District of
Kansas denied teacher's motion to dismiss based on qualified
immunity.

**Holdings:** The Court of Appeals, Carlos F. Lucero, Circuit
Judge, held that:

[1] allegations plausibly suggested a pervasively hostile
environment, and

[2] law holding that sexual harassment was actionable
as Fourteenth Amendment equal protection violation was
clearly established.

Affirmed.

West Headnotes (2)

[1]  **Constitutional Law** 🔑 Elementary and
secondary education

**Education** 🔑 By teachers or other employees

Student's allegations that high school teacher
"routinely and openly" spoke to and about
female students in sexualized terms, and that
he spoke about his own sexual acts in front
of students, plausibly suggested a pervasively
hostile environment, as required to support claim
in § 1983 action against teacher and school
district for violation of Fourteenth Amendment
equal protection by sexual harassment. U.S.
Const. Amend. 14; 42 U.S.C.A. § 1983.

3 Cases that cite this headnote

[2]  **Civil Rights** 🔑 Schools

Law holding that sexual harassment was
actionable as Fourteenth Amendment equal
protection violation was clearly established, and
thus, teacher was not qualifiedly immune from
student's action alleging such violation. U.S.
Const. Amend. 14; 42 U.S.C.A. § 1983.

3 Cases that cite this headnote

**\*830**  (D.C. No. 2:16-CV-02801-JWL-GLR) (D. Kansas)

**Attorneys and Law Firms**

Sarah Alderks Brown, Esq., Dan Curry, Brown & Curry,
Kansas City, MO, for Plaintiffs-Appellees

Gregory P. Goheen, Robert L. Turner, IV, McAnany, Van
Cleave & Phillips, Kansas City, KS, for Defendant-Appellant

Gregory P. Goheen, Robert L. Turner, IV, McAnany, Van Cleave & Phillips, Kansas City, KS, for Defendant

Before LUCERO, KELLY, and MATHESON, Circuit Judges.

**ORDER AND JUDGMENT**[*]

Carlos F. Lucero, Circuit Judge

Brock Hutchinson appeals the district court's denial of his motion to dismiss based on qualified immunity. We conclude that Jane Doe adequately pled a violation of her equal protection rights, and that the law regarding hostile school environment claims was sufficiently clear as to put any reasonable teacher on notice that the alleged conduct was a violation. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

**I**

We draw the following facts from the complaint. Hutchinson is a teacher and football coach at Smith Center High School, located in Smith Center, Kansas. Doe began attending the school in Fall 2013. She alleges that Hutchinson routinely and openly spoke to and about female students in sexualized terms. She claims that Hutchinson's conduct had been ongoing for several years, and that it was common knowledge among school employees that Hutchinson had been involved in an inappropriate relationship with an underage **\*831** student prior to Doe's enrollment at the school.

Doe cites several examples of Hutchinson's misconduct. Beginning in December 2014, Hutchinson began asking Doe's boyfriend, while in the presence of other students, what sexual acts Doe performed. He continued making such inquiries throughout the year. During a gym class, a ball rolled toward Doe. Hutchinson announced to the class, "Don't worry about [Doe], she's used to having balls between her legs." Hutchinson requested that another female student in his gym class "twerk" while she was doing a handstand. He boasted about having talked female students into removing their shirts and engaging in activities in only their sports bras. Even after Doe complained to school officials, Hutchinson continued making sexual comments in front of Doe and other students, and spoke to students about his own sexual acts.

Doe alleges that Hutchinson engaged in other forms of harassing behavior as well. He began calling Doe "dumb" in class. Hutchinson discouraged Doe from attending school sporting events, glared at her in public, and on one occasion sat on her feet in an effort to get her to exit a wrestling match. He told the father of Doe's boyfriend to keep his son away from Doe because she was a "troublemaker." He also stated to a male student who made a crude comment to Doe, "You're going to have her mom riding my ass again." Doe claims she was excluded from a school track meet by a different coach because of her complaints, and that she suffered retaliation and bullying from other students after Hutchinson told them he might be fired. As a result of this harassment, Doe withdrew from the school in October 2016.

Doe and her mother, as next friend, filed suit against Hutchinson and his employer, USD 237, advancing claims under Title IX of the Education Amendments of 1972, and 42 U.S.C. § 1983 for violation of Doe's due process and equal protection rights. Hutchinson moved to dismiss the claims asserted against him, arguing that he is entitled to qualified immunity. The district court granted the motion as to Doe's due process claim, but denied qualified immunity on her equal protection claim. Hutchinson filed a timely notice of appeal.

**II**

A "district court's order rejecting qualified immunity at the motion-to-dismiss stage of a proceeding is a 'final decision' within the meaning of § 1291." Ashcroft v. Iqbal, 556 U.S. 662, 672, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). This rule flows from the doctrine that qualified immunity protects from trial, not just from judgment, and would thus be lost if an interlocutory appeal were not permitted. Mitchell v. Forsyth, 472 U.S. 511, 525-526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). In deciding interlocutory qualified immunity appeals we are limited to purely legal issues and may not review factual disputes. Ortiz v. Jordan, 562 U.S. 180, 188, 131 S.Ct. 884, 178 L.Ed.2d 703 (2011). We review a district court's determination as to qualified immunity de novo. Farmer v. Perrill, 288 F.3d 1254, 1259 (10th Cir. 2002). To determine whether a defendant is entitled to qualified immunity, the court must answer two questions: (1) whether a defendant's conduct violated plaintiff's constitutional rights; and (2) whether the right at issue was clearly established. Roska ex rel. Roska v. Peterson, 328 F.3d 1230, 1239 (10th Cir. 2003).

Because this appeal stems from the denial of a motion to dismiss, we accept as true all well-pled factual allegations in the complaint and view them in the light most favorable to the plaintiff. **\*832** Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Iqbal, 556 U.S. at 678, 129 S.Ct. 1937 (quotation omitted). This standard "does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id. (quotation omitted). "[I]n examining a complaint under Rule 12(b)(6), we will disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest the defendant is liable." Khalik v. United Air Lines, 671 F.3d 1188, 1191 (10th Cir. 2012).

**A**

 [1]   We agree with the district court that Doe has adequately pled a constitutional violation. "Denials of equal protection by a municipal entity or any other person acting under color of state law are actionable under 42 U.S.C. § 1983." Murrell v. Sch. Dist. No. 1, Denver, Colo., 186 F.3d 1238, 1249 (10th Cir. 1999). "It is well established in this circuit that sexual harassment by a state actor can constitute a violation of the equal protection clause." Id.; see also Starrett v. Wadley, 876 F.2d 808, 814 (10th Cir. 1989) (holding that "sexual harassment of the sort alleged by plaintiff can violate the Fourteenth Amendment right to equal protection of the laws").

One form of actionable sexual harassment is "hostile environment harassment." Escue v. N. Okla. Coll., 450 F.3d 1146, 1157 (10th Cir. 2006) (quotation omitted). To prevail on such a claim, a plaintiff must show that the defendant's "conduct was sufficiently severe or pervasive as to interfere unreasonably with her school performance and create a hostile or abusive educational environment." Id. The severe or pervasive inquiry "should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (quotation omitted).[1] Accordingly, the analysis "depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." Oncale, 523 U.S. at 82, 118 S.Ct. 998. Two such considerations are "the ages of the harasser

and the victim." Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 651, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999).

Hutchinson contends the complaint is insufficient to establish a violation because Doe alleges only a single explicitly gender-based comment that was directed toward her. This argument rests on three mistaken premises. First, "[f]acially neutral abusive conduct can support a finding of gender animus sufficient to sustain a hostile ... environment claim when that conduct is viewed in the context of other, overtly gender-discriminatory conduct." O'Shea v. Yellow Tech. Servs., Inc., 185 F.3d 1093, 1097 (10th Cir. 1999). "This is because what is important in a hostile environment claim is the environment, and gender-neutral harassment makes up an important part of the relevant ... environment." Chavez v. New Mexico, 397 F.3d 826, 833 (10th Cir. 2005).

 **\*833**  Second, "incidents of sexual harassment directed at [students] other than the plaintiff can be used as proof of the plaintiff's claim of a hostile ... environment." Hicks v. Gates Rubber Co., 833 F.2d 1406, 1415 (10th Cir. 1987); see also Nieto v. Kapoor, 268 F.3d 1208, 1219 n.7 (10th Cir. 2001) ("A finding of pervasiveness or severity need not rest solely on actions aimed directly at a plaintiff, however, but may also consider harassment of others...."). Doe may rely on evidence that Hutchinson directed gender-based comments to other students to help establish a general atmosphere of harassment "provided she was aware of such conduct." Hirase-Doi v. U.S. W. Commc'ns, Inc., 61 F.3d 777, 782 (10th Cir. 1995), abrogated on other grounds by Burlington Indus. v. Ellerth, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and Faragher v. City of Boca Raton, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

Third, Hutchinson's argument fails to recognize that sexually charged comments, even if not directly about gender, qualify as gender-related under our case law. See O'Shea, 185 F.3d at 1099 (comments in which co-worker "compared his wife to a Playboy magazine and described a dream about a naked woman jumping on a trampoline" are related to "gender or sexual animus"); Penry v. Fed. Home Loan Bank of Topeka, 155 F.3d 1257, 1263 (10th Cir. 1998) (comments comparing the shape of a roof to breasts and a trip to a Hooters restaurant "have gender-related implications"). Although we do not impose "a general civility code," Oncale, 523 U.S. at 80, 118 S.Ct. 998, we include comments and actions that are inherently sexual in nature under the rubric of "gender-related."

With these principles in mind, we conclude that the complaint sufficiently alleges a pervasively hostile environment. Although Hutchinson argues that he directed only a single gender-based comment toward Doe, the complaint contains much more. It alleges that Hutchinson "routinely and openly" spoke to and about female students in sexualized terms, and that he spoke about his own sexual acts in front of students including Doe. Doe provides three examples: (1) Hutchinson's crude statement, made in front of Doe's gym class, that she was "used to having balls between her legs"; (2) his request that another female gym student engage in a sexually suggestive dance; and (3) his boasting that he frequently convinced female students to remove their shirts and engage in activities only in their sports bras. In addition, Hutchinson repeatedly encouraged Doe's boyfriend to share details of Doe's sexual history with other students.[2] He called her dumb, discouraged her from attending events, sat on her feet in an effort to get her to leave an athletic event, and disparaged her to her boyfriend's father. Doe was subject to bullying and eventually withdrew from the school.

These allegations plausibly suggest a pervasively hostile environment and thus suffice at the motion to dismiss stage. See Iqbal, 556 U.S. at 678, 129 S.Ct. 1937; Escue, 450 F.3d at 1157. They provide far more than a "[t]hreadbare recital[ ] of the elements of a cause of action, supported by mere conclusory statements." Iqbal, 556 U.S. at 678, 129 S.Ct. 1937. Doe's citation to numerous specific examples of Hutchinson's **834 alleged pattern of misconduct provides the notice to Hutchinson required by Fed. R. Civ. P. 8.

Moreover, in assessing the requisite degree of severity or pervasiveness to support a hostile environment claim, we must be mindful of "surrounding circumstances, expectations, and relationships," Oncale, 523 U.S. at 81, 118 S.Ct. 998, including "the ages of the harasser and the victim," Davis, 526 U.S. at 651, 119 S.Ct. 1661. Hutchinson's role as high school teacher obviously requires greater sensitivity toward students than would be required as between coworkers. See Oncale, 523 U.S. at 82, 118 S.Ct. 998 ("Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing or roughhousing among members of the same sex, and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive."). In light of all the circumstances as alleged in the complaint, we conclude Doe has plausibly made out a § 1983 claim.

**B**

[2] Hutchinson also appeals the district court's conclusion on the second prong of the qualified immunity analysis. For the law to be "clearly established," there ordinarily must be a Supreme Court or Tenth Circuit opinion on point or the clearly established weight of authority from other circuits must point in one direction. Medina v. City & Cty. of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992) overruled on other grounds by Morris v. Noe, 672 F.3d 1185, 1197 n.5 (10th Cir. 2012). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of the pre-existing law the unlawfulness must be apparent." Mimics, Inc. v. Vill. of Angel Fire, 394 F.3d 836, 842 (10th Cir. 2005) (quotations omitted). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation." Cortez v. McCauley, 478 F.3d 1108, 1114 (10th Cir. 2007) (en banc) (quotations omitted).

Hutchinson relies heavily on White v. Pauly, —— U.S. ——, 137 S.Ct. 548, 196 L.Ed.2d 463 (2017), which stated it was "again necessary to reiterate the longstanding principle that clearly established law should not be defined at a high level of generality" but instead "particularized to the facts of the case." Id. at 552 (quotations omitted). That case reversed a decision of this court denying qualified immunity to officers because it "failed to identify a case where an officer acting under similar circumstances as [defendants] was held to have violated the Fourth Amendment." Id. It held that "general statements of the law" are not sufficient to "create clearly established law outside an obvious case." Id. (quotation omitted).

We have previously held "the law holding that sexual harassment is actionable as an equal protection violation has long been clearly established." Sh.A., 321 F.3d at 1288. In Sh.A., defendant was a fifth-grade teacher who repeatedly touched two boys in his class. He "put his hand down the inside of the boys' shirts and rubbed their chests and backs, and put his hand under their shorts and rubbed their legs from mid-thigh almost up to the point where their legs joined their bodies." Id. at 1286. We rejected the defendant's argument that he was entitled to qualified immunity because "the contours of an equal protection claim by a student on the basis of sexual harassment by a teacher were [not] clearly established in 1997 and 1998 when the conduct at issue took

place," holding that "a reasonable teacher would have known in the spring of 1997 that sexual harassment which gives rise to a violation of equal **\*835** protection in the employment context will also do so in the teacher-on-student context." Id. at 1288-89.

Hutchinson argues that because the facts alleged in the complaint differ from those at issue in Sh.A., which involved physical touching, he is entitled to qualified immunity under Pauly. But Sh.A. did more than hold that the facts presented violated plaintiffs' equal protection rights, it clearly established the proposition that "sexual harassment which gives rise to a violation of equal protection in the employment context will also do so in the teacher-on-student context." Id. At the time of Hutchinson's alleged conduct, we had repeatedly held in the employment context that sexual harassment was an actionable equal protection theory. See, e.g., Starrett, 876 F.2d at 814; Johnson v. Martin, 195 F.3d 1208, 1217 (10th Cir. 1999). And we had applied that rule to hostile environment claims, explaining that "[t]he law on discrimination arising from a hostile environment in the workplace is well established," having been fleshed out by numerous decisions from the Supreme Court and this court with respect to § 1983 and Title VII. Nieto, 268 F.3d at 1217-18.

Accordingly, the question is not whether the facts of Sh.A. were sufficiently similar to those alleged in Doe's complaint, but whether our case law would make it clear to reasonable officials that Hutchinson's alleged conduct created a hostile environment. We have already concluded that Doe's allegations sufficiently allege a pervasively

hostile environment. The law was clearly established that Hutchinson's full course of conduct may be considered, including statements that were not explicitly gender-based and those made to others of which Doe was aware. See Chavez, 397 F.3d at 833; Hicks, 833 F.2d at 1415. As was the proposition that we must consider context including "the ages of the harasser and the victim." Davis, 526 U.S. at 651, 119 S.Ct. 1661. Moreover, our hostile environment jurisprudence includes many cases not involving physical contact. See, e.g., O'Shea, 185 F.3d at 1098-99 (defendant made generalized derogatory comments about women, told others plaintiff was incompetent, told coworkers about a sexual dream, and compared his wife to a Playboy magazine); Bertsch v. Overstock.com, 684 F.3d 1023, 1025-26, 1028 (10th Cir. 2012) (coworker said the department would be better if males were doing the job, had a poster of a scantily clad woman in his cubicle, ridiculed plaintiff in meetings, and refused to look at her).

In light of the foregoing, we conclude that any reasonable high school teacher would have understood that the conduct alleged created a hostile environment in violation of Doe's equal protection rights.

## III

**AFFIRMED**.

### All Citations

728 Fed.Appx. 829

### Footnotes

\*   This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

1   As explained further infra, we consider employment cases as well as educational cases as relevant to the hostile environment standard because "sexual harassment which gives rise to a violation of equal protection in the employment context will also do so in the teacher-on-student context." Sh.A. ex rel. J.A. v. Tucumcari Mun. Schs., 321 F.3d 1285, 1289 (10th Cir. 2003).

2   Hutchinson claims that the inquiries into Doe's sexual behavior cannot be considered in the harassment calculus without prohibiting high school teachers from conducting health classes or making private, appropriate inquiries out of concern for students' wellbeing. We disagree. Construing the complaint in the light most favorable to Doe, see Smith, 561 F.3d at 1098, Hutchinson's inquiries were made either for his own prurient interest or in an effort to demean Doe in front of other students.

**End of Document**                                      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

494 Fed.Appx. 833
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also Tenth
Circuit Rule 32.1. (Find CTA10 Rule 32.1)
United States Court of Appeals,
Tenth Circuit.

Linda **TOWNSEND–JOHNSON**,
Plaintiff–Appellee,

v.

Sue **CLEVELAND**, Superintendent,
in her official and individual
capacity, Defendant–Appellant,

and

Rio Rancho Public Schools, Defendant.

No. 11–2196.
|
June 25, 2012.

**Synopsis**
**Background:** African-American school principal whose
employment contract was not renewed brought civil rights
action against school superintendent, alleging that defendant
deprived her of a contractual relationship and equal protection
of the law on the basis of race. The District Court for
the District of New Mexico, Judith C. Herrera, J., denied
defendant qualified immunity at the pleading stage, and
defendant appealed.

**Holding:** The Court of Appeals, Baldock, Circuit Judge,
held that defendant was not entitled to qualified immunity
from plaintiff's § 1981 and § 1983 claims arising from her
termination.

Affirmed.

West Headnotes (1)

**[1]**    **Civil Rights**   Employment practices
School superintendent was not entitled to
qualified immunity from § 1981 and § 1983
claims of African-American principal arising
from her termination; former principal alleged
that superintendent deprived her of a contractual
relationship and equal protection of the law on
the basis of race, which were clearly established
rights at time of her termination, and she alleged
facts sufficient to show superintendent plausibly
violated those rights. U.S.C.A. Const.Amend.
14; 42 U.S.C.A. §§ 1981, 1983.

7 Cases that cite this headnote

**Attorneys and Law Firms**

**\*833** Christopher Neal Orton, Legal Counseling Services,
Albuquerque, NM, for Plaintiff–Appellee.

Henry F. Narvaez, Carlos E. Sedillo, Narvaez Law Firm, P.A.,
Albuquerque, NM, for Defendant–Appellant.

Before BRISCOE, Chief Judge, BALDOCK and HOLMES,
Circuit Judges.

**ORDER AND JUDGMENT**[*]

BOBBY R. BALDOCK, Circuit Judge.

**\*\*1** Plaintiff Linda Townsend–Johnson, an African–
American female and former public school principal, brought
this civil rights action under 42 U.S.C. §§ 1981 & 1983,
against Defendant Sue Cleveland, Superintendent of Rio
Rancho Public Schools. Among other things, Plaintiff's
complaint alleged Defendant deprived her of a contractual
relationship and equal protection of the law on the basis of
race. The district court denied Defendant qualified immunity
at the pleading stage. Defendant **\*834** appealed pursuant to
28 U.S.C. § 1291. We review the district court's decision de
novo, accepting the complaint's well-pleaded facts as true.
*See Brown v. Montoya,* 662 F.3d 1152, 1162 (10th Cir.2011).
To survive a motion to dismiss under a qualified immunity

ADD.000028

framework, Plaintiff's complaint must allege facts sufficient to show Defendant plausibly violated her federal rights, and those rights were clearly established at the time. *See Robbins v. Oklahoma,* 519 F.3d 1242, 1249 (10th Cir.2008). Applying the appropriate standards, we affirm.[1]

I.

The facts, as alleged in the complaint, are as follows. Rio Rancho Public Schools offered Plaintiff an employment contract to serve as Principal of Puesta Del Sol Elementary School for the 2006–07 school year. Plaintiff began working as principal on August 7, 2006. The Rio Rancho school district generally gives principals six months to prepare their program. On November 10, 2006, however, assistant superintendent Carl Leppelman placed Plaintiff on a developmental growth plan to improve Plaintiff's performance. During their meeting to discuss the plan, Leppelman made remarks regarding "Plaintiff's practice of wearing hats and other attire associated with the African–American communities." Leppelman made such remarks on several subsequent occasions as well. Plaintiff believed her one-on-one meeting with Leppelman "was unproductive, harassing, unjust, and led [her] to question the level of patronage she would be receiving from her superiors in the future." Two days later, Plaintiff met with Defendant Cleveland and informed her of Leppelman's behavior. Plaintiff provided Defendant with a letter, detailing her concerns. Plaintiff continued to voice concerns about her supervisors' competency through the end of 2006. On January 14, 2007, Plaintiff and Defendant again met. Defendant urged Plaintiff to contact Human Resources about her concerns. Plaintiff met with Human Resources to discuss Leppelman's alleged harassment. Plaintiff agreed to mediation, but a scheduled meeting never occurred and the school district failed to reschedule the mediation. On March 14, Plaintiff told Defendant she intended to inform the School Board of her concerns.

On April 9, Leppelman informed Plaintiff that he would not recommend her employment contract be reinstated for the following year. On April 17, Plaintiff provided **\*835** a letter to her superiors, attempting to clarify and dismiss false allegations Leppelman made against her to Defendant. On May 18, Defendant notified Plaintiff she would not renew Plaintiff's employment contract because Defendant feared Puesta Del Sol would not achieve the school district's Adequate Yearly Progress (AYP) goals.[2] At the same time,

however, numerous other schools in the district likely would not achieve the AYP goals. These schools' principals, all of whom were retained, were not African–American females. Plaintiff requested a hearing with the school board regarding the non-renewal of her contract and the alleged discriminatory treatment. The school board did not grant Plaintiff a hearing.

**\*\*2** Plaintiff subsequently filed her civil rights complaint which Defendant moved to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) on the basis of qualified immunity. The district court denied Defendant's motion. The district court reasoned the facts alleged in the complaint, taken as true, raise an inference that Defendant treated Plaintiff differently than employees outside her protected class. The district court further concluded the right to be free from race-based discrimination was clearly established law at the time of the alleged violations.

II.

On appeal, Defendant challenges the district court's qualified immunity decision with regard to both the § 1981 and § 1983 claims. Defendant, however, does not differentiate between the two claims in her brief. Rather, in support of her argument, she relies almost exclusively upon our equal protection "class of one" jurisprudence. Moreover, Defendant does not challenge whether the law was clearly established, but instead argues the district court erred in denying qualified immunity because Plaintiff's complaint fails to allege facts sufficient to show Defendant plausibly violated her constitutional rights. In particular, Defendant asserts Plaintiff's complaint must contain an express allegation specifically naming a "similarly situated" principal in the school district who was treated more favorably than Plaintiff.

At this stage of the litigation, we examine whether Plaintiff's complaint contains "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Although detailed factual allegations are not required, a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal quotation marks omitted). To withstand a motion to dismiss pursuant to Rule 12(b)(6), the factual allegations in Plaintiff's complaint, accepted as true, must "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when

ADD.000029

the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is **\*836** liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937.

### A.

We will first address why Plaintiff did not allege a class of one equal protection claim against Defendant before turning to whether Plaintiff alleged sufficient facts to nudge her "claims across the line from conceivable to plausible." *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955. "[T]he Equal Protection Clause protects persons, not groups." *Engquist v. Or. Dep't of Agric.,* 553 U.S. 591, 597, 128 S.Ct. 2146, 170 L.Ed.2d 975 (2008) (internal quotation marks omitted). The Supreme Court's "equal protection jurisprudence has typically been concerned with governmental classifications that affect some groups of citizens differently than others." *Id.* at 601, 128 S.Ct. 2146 (internal quotation marks omitted). In such a case, a plaintiff alleges she has been "arbitrarily classified as [a member] of an identifiable group." *Id.* (internal quotation marks omitted). But the Supreme Court has recognized that "an equal protection claim can in some circumstances be sustained even if the plaintiff has not alleged class-based discrimination, but instead claims that she has been irrationally singled out as a so-called 'class of one.' " *Id.* We subsequently based our decision in *Kansas Penn Gaming, LLC v. Collins,* 656 F.3d 1210 (10th Cir.2011), on a class of one theory.

**\*\*3** Here, Plaintiff's complaint does not allege a class of one equal protection violation. Plaintiff did not once allege Defendant irrationally singled her out for adverse treatment. Rather, Plaintiff's equal protection count states Defendant's actions "were taken against Plaintiff because of her race." Thus, Plaintiff alleges class-based discrimination. Moreover, even if Plaintiff had alleged a class of one claim, the Supreme Court has held "the class-of-one theory of equal protection does not apply in the public employment context."[3] *Engquist,* 553 U.S. at 598, 128 S.Ct. 2146.

### B.

Having determined Plaintiff alleged a race-based equal protection claim rather than a class of one claim, we now must decide whether Plaintiff has alleged sufficient facts to support her claims of race discrimination under § 1981 and

violation of equal protection under § 1983. Although "the 12(b)(6) standard does not require that Plaintiff establish a prima facie case in her complaint, the elements of each alleged cause of action help to determine whether Plaintiff has set forth a plausible claim." *Khalik v. United Air Lines,* 671 F.3d 1188, 1192 (10th Cir.2012). "In racial discrimination suits, the elements of a plaintiff's case are the same whether that case is brought under §§ 1981 or 1983 or Title VII." *Carney v. City & Cnty. of Denver,* 534 F.3d 1269, 1273 (10th Cir.2008) (quoting *Baca v. Sklar,* 398 F.3d 1210, 1218 n. 3 (10th Cir.2005)). "To make out a prima facie case of discrimination, [Plaintiff] must demonstrate (1) membership **\*837** in a protected class, (2) adverse employment action, and (3) disparate treatment among similarly situated employees." *Id.* (quoting *Orr v. City of Albuquerque,* 417 F.3d 1144, 1149 (10th Cir.2005)).

In *Khalik,* an Arab–American alleged race discrimination. Although we knew the plaintiff was Arab–American, we had no context for when the plaintiff complained of race discrimination or to whom. 671 F.3d at 1194. The plaintiff did not allege whether other Arab–Americans were treated differently and we had no allegation about how the defendant treated the plaintiff compared to other non-Arabic or non-Muslim employees. *Id.* Put simply, the complaint contained no facts relating to the alleged discrimination. Accordingly, we concluded the plaintiff's allegations were "conclusory" and "formulaic recitations" because the plaintiff in that case only made "general assertions of discrimination and retaliation, without any details whatsoever of events leading up to her termination." *Id.* at 1193.

Unlike in *Khalik,* Plaintiff in this case has alleged plausible claims for relief. Plaintiff alleged she is an African–American and that Defendant terminated her employment. She provided facts alleging she complained about race discrimination throughout the school year. These specific acts included Leppelman's comments regarding Plaintiff's attire. The complaint alleges Plaintiff complained to Defendant as well as to the Human Resources Division. Importantly, Plaintiff alleges *all* non-female-African-American principals whose schools did not meet AYP goals had their contracts renewed for the next school year. This allegation is more than a mere legal conclusion. Plaintiff does not simply allege she was an African–American and fired. Rather, she alleges the non-female-African-American principals in the school district who failed to meet their AYP goals were not terminated. Thus, Plaintiff identified, in her complaint, a group of non-female-African-American employees who Defendant allegedly treated differently. Plaintiff has sufficiently plead

ADD.000030

her claims for race discrimination and violation of equal protection.

**\*\*4** Defendant, however, argues Plaintiff cannot merely say she is in a protected class. Instead, Defendant asserts Plaintiff must identify specific individuals so she can understand the nature of the complaint and be put on notice. Defendant is correct merely stating one's race is insufficient under our pleading standard. *Khalik,* 671 F.3d at 1194. But Defendant is incorrect to state that Plaintiff failed to place her on notice. Defendant is the superintendent of a school district. We can reasonably infer she is aware of whom *she* employs as principals in her schools. Likewise, as the head of the school district, she is aware of which schools in her district meet AYP goals. Accordingly, Plaintiff put Defendant on notice by identifying a *specific* group of individuals—non-female-African-American principals in the Rio Rancho school district whose schools did not meet AYP goals.[4]

For these reasons, the district court's determination to deny qualified immunity **\*838** to Defendant Cleveland on Plaintiff's race discrimination and equal protection claims is AFFIRMED.

**All Citations**

494 Fed.Appx. 833, 2012 WL 2369335

Footnotes

\*    This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R.App. P. 32.1 and 10th Cir. R. 32.1.

1    Our jurisdiction generally extends to "final decisions" of the district courts. 28 U.S.C. § 1291. But a district court's "interlocutory" decision is also appealable if it falls within "that small class which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 546, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). Accordingly, "[a]n appealable interlocutory decision must ... conclusively determine the disputed question and that question must involve a claim of right separable from, and collateral to, rights asserted in the action." *Mitchell v. Forsyth,* 472 U.S. 511, 527, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (internal quotation marks and citation omitted). Because a district court's qualified immunity decision meets this criteria, "Defendants are permitted to appeal from the denial of a motion to dismiss on qualified immunity grounds precisely to spare them the ordeal of discovery if the complaint fails to allege a constitutional violation or if the alleged violation was not clearly established." *Robbins,* 519 F.3d at 1249 (citing *Behrens v. Pelletier,* 516 U.S. 299, 306, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996)).

2    Although both parties and the district court represented "AYP" stood for "Annual Yearly Progress," AYP actually stands for "Adequate Yearly Progress." "AYP represents the annual academic targets in reading and math and other indicators that the state, school district and schools must reach to be considered on track with the federally mandated goal of 100% proficiency by school year 2013–2014." New Mexico Public Education Department, Frequently Asked Questions about AYP, http://ped.state.nm. us/ayp2011/AYPFAQ2011.pdf.

3    Defendant also posits that we will become a "general purpose second guesser" if we allow claims such as Plaintiff's to proceed beyond the motion to dismiss stage. In holding public employees cannot make class of one claims, the Supreme Court reaffirmed the "Equal Protection Clause is implicated when the government makes class-based decisions in the employment context, treating distinct groups of individuals categorically differently." *Engquist,* 553 U.S. at 605, 128 S.Ct. 2146. Because Plaintiff makes such a claim in this case, Defendant is incorrect in her assertion.

4    Defendant, at oral argument, posited that by affirming the district court, we would impose the burden of proceeding with discovery "upon these Defendants who are supposed to have qualified immunity." As mentioned above, the only defendants who are *supposed* to have qualified immunity are those that have not violated a clearly established constitutional right. Taking the facts of Plaintiff's complaint as true, Defendant failed to renew Plaintiff's contract because she is an African–American, which is a violation of a clearly established constitutional right.

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

ADD.000031